**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| JEREMY LAYTON, AS ADMINISTRATOR OF THE ESTATE OF JONATHAN LAYTON, NANCY LAYTON, INDIVIDUALLY, AND FREDDIE LAYTON JR, INDIVIDUALLY, *Plaintiffs*, | § § § § § § | |
| v. | § § | No. _____ |
| SMITH COUNTY, TEXAS, SHERIFF LARRY SMITH, LARRY SMITH (INDIVIDUALLY), DEPUTY SHERIFF BRAYLON J. BARNES, FAITHCO ENTERPRISES, INC., INC., D/B/A FAITHCO PLUMBING, LLC, AND TAYLOR TRACY, INDIVIDUALLY, *Defendants*. | § § § § § § § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiffs Jeremy Layton, as the Administrator of the Estate of Jonathan Layton (the "Estate") and Nancy Layton and Freddie Layton Jr., Individually (collectively "Layton Family"), and file this Complaint and Demand for Jury Trial ("Complaint") against Defendants Smith County, Texas, Larry Smith, both personally and in his capacity as Smith County Sheriff, Deputy Sheriff Braylon J. Barnes ("Deputy Barnes"), FaithCo Enterprises, Inc., d/b/a FaithCo Plumbing, LLC ("FaithCo"), and Taylor Tracy.

Pursuant to 42 U.S.C. § 1983, Plaintiffs assert claims for violations of the Second, Fourth, and Eighth Amendments to the Unites States Constitution against Deputy Barnes, Larry Smith and Smith County for the unlawful and unjustified killing of Jonathan Layton in his own home on November 5, 2024. Additionally, Plaintiffs assert state law claims against Taylor Tracy, FaithCo and Larry Smith for the malicious slander of Jonathan Layton, FaithCo's wrongful termination of

PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY – Page 1

Jonathan Layton under the Texas Labor Code, and their negligent, grossly negligent, reckless and intentional conduct described herein that resulted in unimaginable pain, suffering, grief, and emotional distress to Jonathan Layton and the Layton Family.

## PARTIES

1.    Jonathan Layton died intestate on November 5, 2024, while residing in Smith County, Texas.

2.    Jonathan Layton's heirs at law are his mother, Nancy Layton, and his siblings, Freddie Layton, Jr., Jeremy Layton, Jeffrey Layton, and Krystle Layton-Furrh.

3.    Plaintiff Jeremy Layton is the Administrator of the Estate of Jonathan Layton.

4.    Jeremy Layton was appointed as administrator of the Estate on February 18, 2025. Jeremy Layton brings this action as Administrator of the Estate and as heir at law.

5.    Plaintiff Nancy Layton is the surviving mother of Jonathan Layon.

6.    Nancy Layton is a resident of Smith County, Texas. She brings this action individually, as the mother of Jonathan Layton, as a bystander, and as heir at law.

7.    Plaintiff Freddie Layton, Jr. is a resident of Smith County, Texas.

8.    Freddie Layton, Jr., brings this action individually, as a bystander, and as heir at law.

9.    Defendant Smith County, Texas is a local government unit in the State of Texas.

10.    Defendant Larry Smith and Deputy Barnes worked for Smith County, Texas on November 5, 2024, and at all times on November 5, 2024, and thereafter were acting within the course and scope of their employment.

11.    Smith County may be served through County Judge Neal Franklin, Smith County Annex Building, 200 E. Ferguson, Suite 100, Tyler, Texas 75702. Smith County is represented by counsel David Iglesias who has agreed to accept service on Smith County's behalf.

12.    Defendant Larry Smith is the Sheriff of Smith County, Texas, and on November 5, 2024, Sheriff Smith was the commanding officer of Deputy Barnes and final policy maker for the Smith County Sheriff's office.  Larry Smith in both his individual capacity and as Smith County Sheriff is represented by counsel David Iglesias who has agreed to accept service on Mr. Smith's behalf.

13.    Defendant Deputy Barnes at all times referred to herein was and remains a deputy with the Smith County Sheriff's Department. Deputy Barnes is represented by counsel David Iglesias who has agreed to accept service on Smith County's behalf.

14.    Upon information and belief, Defendant FaithCo Enterprises, Inc., is a corporation with 100% control and ownership of FaithCo Plumbing, LLC. Their name and likeness are interchangeable.

15.    Upon information and belief, FaithCo Plumbing LLC., and FaithCo Enterprises Inc., operate as one entity under the direct control and management of a single person, John Melahn, who operates as Director and President of both entities.

16.    Defendant FaithCo Enterprises, Inc., is a Texas domestic for-profit corporation based in Lindale, Smith County, Texas. FaithCo may be served by serving its registered agent, John F. Berry, at 100 Independence Place, Suite 400, Tyler, Texas 75703.  FaithCo is represented by counsel David Iglesias who has agreed to accept service on FaithCo's behalf.

17.    Defendant FaithCo Plumbing, LLC, is a Texas Limited Liability Corporation based in Lindale, Smith County, Texas. FaithCo may be served by serving its registered agent, John F. Berry, at 100 Independence Place, Suite 400, Tyler, Texas 75703. FaithCo is represented by counsel David Iglesias who has agreed to accept service on FaithCo's behalf.

18.     Taylor Tracy is an individual residing in Smith County, Texas.  Tracy is an officer of FaithCo Enterprises, Inc. and/or FaithCo Plumbing, LLC. He may be served at 18601 U.S. Hwy 69 North, Suite A, Lindale, Texas 75771.

## JURISDICTION & VENUE

19.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 & 1343 because the controversy arises under the United States Constitution and 42 U.S.C. § 1983. This Court has authority to award attorney's fees pursuant to 42 U.S.C. § 1988.

20.     The Court has pendent jurisdiction over the intertwined and related state law claims against Taylor Tracy under 28 U.S.C. § 1367(a).

21.     The Court has pendent jurisdiction over the intertwined and related state law claims against FaithCo under 28 U.S.C. § 1367(a).

22.     The Court has pendent jurisdiction over the intertwined and related state law claims against Larry Smith under 28 U.S.C. § 1367(a).

23.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because the events giving rise to the claims in this Complaint occurred in the Eastern District of Texas.

## FACTUAL ALLEGATIONS

24.     This action is brought under 42 U.S.C. §§ 1983 & 1988, and the Second, Fourth, and Fourteenth Amendments to the United States Constitution, TEX. CIV. PRAC. & REM. CODE CHAPTER 71, TEX. LAB. CODE § 451, and common law.

### The Layton Family

25.     Prior to November 5, 2024, Jonathan, Nancy and Freddie, Jr. lived as peaceful, productive members of Lindale, Texas, a community in Smith County, Texas.

26.    Jonathan Layton was born in Tyler, Texas in 1984. He lived in Lindale, Texas from the time he was two years-old until his death.



27.    Jonathan's parents, Nancy and Freddie Layton, Sr. moved from Tyler to Lindale in 1987 to raise their five children, Krystle, Freddie Jr., twins Jeffrey and Jonathan, and Jeremy. All five children graduated from Lindale public schools and attended First Baptist Church in Swan.

28.    Jonathan's father, Freddie Sr., worked for Coca Cola for several decades before going to work at the Hideaway Lake maintenance barn and starting Layton Lawn Care, a landscaping business serving Lindale and the surrounding community. Nancy worked at Wal-Mart for over 20 years, including at the Lindale Wal-Mart from the time it opened until she retired in 2019.

29.    The members of the Layton family have all been productive, active members of their community: Krystle is self-employed, owning a cleaning business; Freddie Jr. followed in his mother's footsteps and now works at Sam's Club in Tyler; Jeffrey is a sergeant with the Texas Department of Corrections at the Tennessee Colony prison; and Jeremy, who was a Lindale fireman and EMT for twelve years, owns his own occupational health and safety business. None of the members of the Layton family have a criminal record.

PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY – Page 5

30.    Jonathan enjoyed working with his father in the lawn care business until Freddie, Sr. died in 2018.  After his father's death, Jonathan continued the lawn care business for several years. Jonathan, or "Cowboy" as many knew him, enjoyed taking care of people, especially his elderly lawn care clients.

31.    Jonathan had never been arrested for a violent crime and had no history of violence.

32.    As shown below, Jonathan also had faith in law enforcement.

33.    Around October 23, 2017, Jonathan stopped a domestic abuse situation involving a minor. He stood by the minor waiting for the police to arrive to protect the child from further abuse. Jonathan called the police when needed and trusted them to act appropriately and professionally.

34.    On another occasion in 2020, Jonathan called the police to help recover his stolen vehicle and trailer.

35.    On May 8, 2021, Jonathan again trusted the police. He called the Smith County Sheriff's Office to report that he had found a lost wallet and then waited for a deputy to arrive and retrieve it.

36.    Jonathan had no animosity or distrust toward law enforcement.

## Jonathan's Job at FaithCo

37.    While Jonathan worked throughout his life, he was especially proud when he was hired by FaithCo in April 2022 as a plumber's apprentice.[1] Jonathan was excited to have a career in a respected trade. He was training to be a journeyman plumber.

38.    Jonathan bonded with some of his co-workers at FaithCo and started attending Calvary Commission with them. Jonathan spent most Sunday and Wednesday evenings with his church family. Jonathan thought he had found a long-term career at FaithCo.

---

[1] Exhibit 1, Jonathan Layton (Personnel Records, FaithCo Plumbing LLC).

39.     However, Jonathan's work at FaithCo took a toll on his body. On July 30, 2024, more than two years after he started at FaithCo, Jonathan was diagnosed with a bilateral inguinal hernia.[2]

40.     While he had noticed some swelling earlier, the pain only began in the summer of 2024. This type of hernia is caused by squatting, lifting, and strenuous activity – the type of activities Jonathan performed at FaithCo.

41.     FaithCo failed to report Jonathan's injury to FaithCo's workers' compensation carrier. FaithCo convinced Jonathan to claim that his injury was not job related in order to allow FaithCo to avoid a reportable injury that would impact its workers' compensation insurance rates.

42.     Jonathan's injury was a "compensable injury" under the Texas Labor Code.  It was "damage or harm to the physical structure of the body" that would normally occur or be exacerbated by strenuous activity within the course and scope of his regular duties as a plumber's assistant.  TEX. LABOR CODE ANN. §401.011.

43.     Despite the painful injury, Jonathan continued working until September 26, 2024, the day before he had major surgery under general anesthesia.

44.     On that same day, Taylor Tracy sent Jonathan a card to which Jonathan responded via text, "Thanks for the card and I'm not going anywhere. Th[is] is [the] company where I want to be and learn and grow."[3]

45.     Jonathan had surgery on September 27, 2024.

---

[2] Exhibit 2, UT Tyler Hospital (Medical Records for Jonathan Layton).
[3] *See* Exhibit 3, Text Message from J. Layton, "Thanks for the card and I'm not going anywhere. These is company is where I want to be and learn and grow", to T. Tracy (September 26, 2024).

46.     After his follow-up doctor visit on October 11, 2024, Jonathan was released to light duty on October 15 with a class 3 impairment rating and instructions not to lift more than ten (10) pounds.[4]

47.     FaithCo, however, refused Jonathan light duty for his on-the-job injury. FaithCo instructed Jonathan to stay home (unpaid).[5]

48.     FaithCo convinced Jonathan to say the injury was not job-related and tried to assist him in filing a claim under FaithCo's short-term disability policy.[6] On that application, Jonathan noted that one of his duties at FaithCo was "Lifting."[7]

49.     Jonathan's light-duty period ended on October 25, 2024, but FaithCo still did not allow him to return to work. On October 24, 2024, Jonathan texted his frustration to Kelsie Denise, "Yea, it's been a month I just got to wait on [FaithCo] to agree to it."[8]

50.     FaithCo and Taylor Tracy, however, decided to get rid of Jonathan rather than give him light duty or take a chance on another injury compensable through workers' compensation. Getting rid of an injured employee eligible for workers' compensation and FMLA leave posed a problem.[9] Taylor Tracy needed an excuse to fire Jonathan. The potential solution presented itself in the form

---

[4] Exhibit 1; Exhibit 2.
[5] Exhibit 2; *See also* Exhibit 3.
[6] Exhibit 4, Email from Jonathan Layton and Meagan Craft, Short Term Disability, Tiffany Ndao (October 11, 2024, at 3:04PM through 3:32PM and October 21, 2024, at 3:24PM).
[7] Exhibit 1 at 44.
[8] Exhibit 5, Snapchat Message from J. Layton, "the doctor said I could but its up to them" "Yea it's been a month I just got wait on them to agree to it", to Kelsie Denise (October 24, 2024 at 2:32PM, 3:32PM).
[9] The Family and Medical Leave Act (FMLA) provides certain employees with up to 12 weeks of unpaid, job-protected leave per year. It also requires that their group health benefits be maintained during the leave. "Employees are eligible for leave if they have worked for their employer at least 12 months, at least 1,250 hours over the past 12 months, and work at a location where the company employs 50 or more employees within 75 miles. Whether an employee has worked the minimum 1,250 hours of service is determined according to FLSA principles for determining compensable hours or work." https://www.dol.gov/general/topic/benefits-leave/fmla.

of a current FaithCo employee and former sex shop worker, Brooke, with whom Jonathan had exchanged consensual, explicit Snapchat messages.[10]

51.     On or about October 24, another employee at FaithCo told Jonathan that Brooke had mentioned to people at the company that Jonathan had sent her Snapchats about "making out" and some explicit photos.[11]

52.     Jonathan expressed his frustration and embarrassment about this to Kelsie Denise, "I am probably getting fired."[12]

53.      "Why"[13] Kelsie responded.

54.     "Can't say anything 'cause I'm not supposed to know. But it has to do with what every [sic] Brooke told them"[14]

55.     Kelsie, "What did she say?"[15]

56.     "Was talking on snap and she said I said stuff to her that she didn't like . . .which is bullshit because it was her to[o] [sic]." Jonathan then shared with Kelsie Denise the nude photos that Brooke had sent **to him** via Snapchat. [16]

57.     Kelsie replied "You need to tell them that. That's bullshit."[17]

---

[10] Exhibit 6, Brooke [sic], Complaint letter, (October 29, 2024)(on file with FaithCo).

[11] *See* Exhibit 7, Snapchat messages from J. Layton and K. Denise, "the doctor said  I could but its up to them" "Yea it's been a month I just got wait on them to agree to it", to J. Layton and K. Denise  (October 24, 2024, at 6:39PM through October 24, 2024, at 7:31); *See Also* Exhibit 6 (" . . .the conversation turned uncomfortable when a discussion about 'making out' was brought up continuously. . . ").

[12] Exhibit 7 at 6:45PM.

[13] *Id.* at 7:08PM.

[14] *Id.* at 7:10PM.

[15] *Id.* at 7:10PM.

[16] *Id.* at 7:15PM.

[17] *Id.* at 7:15PM.

58.     Jonathan, "I'm just waiting on them to decide what they want to and I **talk to a lawyer** I mow for and told me what I could do if they fire me and not her.  Please don't say anything to her about please. That's why I haven't been up there I'm going try and talk to Thomas after work tomorrow"[18] (emphasis added).

59.     Kelsie replied, "I won't say shit she hasn't told me anything but probably because she knows I'll be pissed."[19]

60.     Jonathan then concluded the chat, "K thanks ur awesome." [20]

61.     By threatening to go to a lawyer, Jonathan caused more problems for FaithCo. Not only was Jonathan protected under FMLA for his medical leave, but an attorney would also likely investigate Jonathan's injury and his eligibility for workers' compensation benefits.

62.     Jonathan was clearly embarrassed that Brooke had shared what he thought was a private, consensual conversation, but up until November 5, 2024, he was hopeful that he still had a job at FaithCo.

### November 5, 2024

63.     On November 5, 2024, Jonathan was resting at home, but he was still hopeful of returning to work. He had been released to full duty by his doctor on October 25 and was waiting for FaithCo to allow his return.[21]

64.     At 11:23 a.m., an employee at FaithCo, Ronnie, tried to call Jonathan. When Jonathan did not answer, Ronnie texted, "Hey buddy just wanted to remind you that you have some tools in the tool room."[22]

---

[18]*Id*. at 7:16PM.
[19]*Id.* at 7:30PM.
[20] Id. at 7:31PM.
[21] Exhibit 7.
[22] *See* Exhibit 8, Text Messages from Ronnie FaithCo, Tools at FaithCo, to J. Layton (November 5, 2024, at 11:24AM).

65.    Jonathan responded, "Yea, I still [got] to bring my letter up there," referring to a doctor's note related to his hernia injury and release to full duty.[23]

66.    Ronnie responded, "Ok just didn't want you to forget they were here."[24]

67.    Later at 11:53 a.m., Jonathan texted Ronnie, "They didn't fire me did they?"[25]

68.    Ronnie responded, "Not that I know of."[26]

69.    Thirty minutes later at 12:26 p.m., Taylor Tracy called Jonathan, and they spoke on the phone for 57 seconds.[27]

70.    After the call with Taylor Tracy, Jonathan continued watching country music videos on YouTube™ and made plans to meet a friend, Ben Sims, later in the day after work at 5 p.m. He then got into his truck and drove to FaithCo.[28]

71.    A surveillance camera inside FaithCo's shop recorded Jonathan's visit to FaithCo to retrieve his tools.

72.    The video shows FaithCo employees at 12:42 p.m. helping Jonathan carry his belongings to his truck.[29]

> While leaving the shop, there was a disagreement as to whether certain fittings or tools belonged to Jonathan, which led to following conversation between Jonathan and the FaithCo employee walking him out:

---

[23] *See* Exhibit 9, Text Messages from J. Layton, job status, to Ronnie FaithCo (November 5, 2024 at 11:53AM).
[24] *Id.*
[25] *See* Exhibit 10, Jonathan Layton Phone Logs November 5, 2024 11:56AM.
[26] *Id.* at 11:56AM.
[27] *See* Exhibit 10, Jonathan Layton Phone Logs November 5, 2024 11:56AM through 12:33PM.
[28] *Id.* at 12:33PM.
[29] *Id.*; Exhibit 11, FaithCo Interior Surveillance Video.

Jonathan: "Fuck it, I'll take care of it."

FaithCo Employee: "Let's don't do this, come on"

Jonathan: "I'll do it myself"

FaithCo Employee: "Don't do this"

Jonathan: "I have something that will take care of this at home."

FaithCo Employee: "Don't do that."

Jonathan: "this is bullshit, I'll take care of it myself."[30]

73.     The surveillance video does not reveal anything that would allow a reasonable person to assume or conclude that Jonathan intended to commit any violence. After the comment, two FaithCo employees continued helping Jonathan put his things in his truck. One of the employees who assisted Jonathan then gives a thumbs up and nonchalantly heads off to a company truck.[31]

74.     There was no sense of alarm or urgency, no confrontation and certainly no threats of violence.

---

[30] *Id.*
[31] Exhibit 12, FaithCo Exterior Surveillance Video.



*Still frame from FaithCo Exterior Surveillance Camera at 12:42PM on November 5, 2024.*

75.    Jonathan could have been referring to several things as the "something at home" — his doctor's note that he had mentioned to Ronnie, which according to his mother, he had left at home, or receipts showing he owned the fittings over which there was a disagreement.

76.    It was not reasonable or rational to assume from that off-handed comment that Jonathan intended violence.

77.    One of the last things said to Jonathan before he left was to remind him to ***come back to FaithCo*** to return his uniforms.

78.    Nevertheless, at 12:46 p.m. – just after Jonathan had packed his truck and left – Taylor Tracy – needing a further excuse to fire an injured worker – called Smith County 911 and reported that Jonathan had threatened to return to FaithCo and ***kill everyone***. That call is transcribed below:

> *911 Call to Smith County Sheriff's Office from FaithCo, 12:46:34 p.m. November 5, 2024*
>
> Operator:            Smith County 911, what is the emergency?

| Taylor Tracy: | -uh-. yes ma'am, I have a -uh- threat to my company and personal by a -uh- disgruntled employee that I just fired, ***saying that he was gunna*** - |
| Operator: | what's the address? |
| Taylor Tracy: | . . . - ***potentially kill us all***. |
| Taylor Tracy: | It is FaithCo at 18601 U.S. Highway 69 North. |
| Operator: | What is your last name? |
| Taylor Tracy: | Tracy, T-R-A-C-Y. |
| Operator: | Your First name? |
| Taylor Tracy: | Taylor |
| Operator: | And a phone number for you? |
| Taylor Tracy: | 903-840-8224 |
| Operator: | Okay, and how did he threaten you, was he on location? |
| Taylor Tracy: | Yes |
| Operator: | Okay, and is he still there? |
| Taylor Tracy: | No. |
| Operator: | And what was his name? |
| Taylor Tracy: | Jonathan Layton, he said that he was going to his house to get something to ***take care of all of us***. |
| Operator: | And what does he drive? |
| Taylor Tracy: | A white Chevy Silverado, he lives off of 2710. |
| Operator: | Okay, I will get officers on the way.[32] |

---

[32] Exhibit 13, Transcript of 911 call recording.

PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY – Page 14

79.     Seeing an opportunity to create a record to fire Jonathan for cause, Taylor Tracy, a Vice-President at FaithCo, during the course and scope of his employment, called 911 and falsely reported that Jonathan had threatened to come back to FaithCo and "kill us all." This statement was knowingly false.[33] Taylor Tracy was not on the video where the statement was made. His actions in calling 911 were negligent, grossly negligent, reckless and/or intentional.

80.     Jonathan, however, merely stated in the context of a disagreement over ownership of some plumbing fittings that "I'll do it myself" and "I have something at home that will take care of this." The conversation is recorded.[34]

81.     He never said, "I have something that will take of y'all," and certainly never said he was going to kill anyone. The 911 call was a pretext for further justification to fire Jonathan and keep him from coming back to full-duty work or making a workers' compensation claim.

82.     Making a false report of a criminal offense to a law enforcement agency to which the officers respond is a third-degree felony.  TEX. PENAL CODE § 42.0601.

83.     The 911 call was a reckless, intentional and criminal act to justify the wrongful firing of Jonathan Layton in retaliation for suggesting that he needed an attorney after his on-the-job injury.

84.     At 12:54, Jonathan texted Kelsie Denise at FaithCo saying merely, "Hey I just got fired for all that crap." He made no threats.[35]

85.     One minute later, in response to Taylor Tracy's false report in the 911 call, the Smith County Sheriff's office dispatched Defendant Deputy Barnes who arrived at FaithCo at 12:55.[36]

---

[33] *Id*.
[34] *See* Exhibit 11.
[35] Exhibit 14, Snapchat Message from J. Layton, Events at FaithCo, to Kelsie Denise (November 5, 2024, at 12:54PM).
[36] Exhibit 15, Body Camera Footage, Arrival and Events at FaithCo Premises, Braylon Barnes_20241105125_BWL7011558-0 at 12:55PM.

86.    Officer Barnes' body camera recorded the following conversation with a FaithCo employee:

| | |
|---|---|
| Deputy Barnes: | How you doin? |
| FaithCo Employee: | Good sir, I hate to bother you, we had to let a guy go. |
| Deputy Barnes: | Okay. |
| FaithCo Employee: | And he was sending obscene -uh- photos and pictures to two of the employees and -uh- we found out and had to terminate him. |
| Deputy Barnes: | Okay. |
| FaithCo Employee: | We had no choice and we told him and I took him inside to get his stuff and he got mad and said that "some of my fittings are gone" and I said "no those are parts that need to stay here" and (quoting Jonathan) "I got something at home and I can take care of all y'all" he said it twice. And he is shaking real bad and Jonathan is a little off so uh, I just need to call someone, you know. |
| Deputy Barnes: | Okay, and what's his name? |
| FaithCo Employee: | Jonathan uh, (calls out to another employee) "what's Jonathan's last name?" |
| FaithCo Employee: | Jonathan, uh (pause to uncrumple sticky note) this is his address here, let me go and get his name, (to off view employee) what's his last name? Layton, Layton. |
| Deputy Barnes: | Okay |
| FaithCo Employee: | L-A-Y-T-O-N. |
| Deputy Barnes: | (to second employee walking up) Hey man. |

| | |
|---|---|
| Deputy Barnes: | When did all this happen? |
| FaithCo Employee: | Oh just about fifteen minutes ago, you're fast, huh, you're fast, he's the guy that has that white Chevrolet that's loaded down with junk. |
| Deputy Barnes: | Oh I passed him on the way up here. |
| FaithCo Employee: | You that's him. |
| Deputy Barnes: | He was wearing a red shirt? |
| FaithCo Employee: | Yup, yup. |
| Deputy Barnes: | Okay. |
| Deputy Barnes: | ***He didn't look too upset***, but I'm sure he saw that and |
| FaithCo Employee: | changed his mind. |
| Deputy Barnes: | But okay, I'll tell you what, I will go and keep an eye out, I was going up here to run traffic anyways so I thought I'd just see. |
| FaithCo Employee: | I appreciate that. |
| Deputy Barnes: | I thought about pulling that truck over because it looked good, now I shoulda stopped it. |
| FaithCo Employee: | [laughs] use that, Always use that. |
| Deputy Barnes: | [laughs] Yessir. |
| FaithCo Employee: | [laughs] Go with your instincts. |
| Deputy Barnes: | If ya'll see him up here just call us, we'll look for him.[37] |

---

[37] Exhibit 16, Braylon Barnes Body Worn Camera for November 5, 2024, at 12:55-12:58.

PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY – Page 17

87.     During this conversation, the FaithCo employee, who could not even remember Jonathan's last name, gave Deputy Barnes a slip of paper with Jonathan's home address.[38]

88.     In handing this address to Deputy Barnes, FaithCo sent the deputies to Jonathan's home. Defendant Tracy intended for the deputies to respond to his false report of death threats with the specific intent to use the Smith County Sheriff to intimidate a former, wrongfully terminated employee. Every element of Texas Penal Code section 42.0601was satisfied.



89.     However, after this discussion, Deputy Barnes should have suspected that the 911 call claiming a threat was either false or extremely exaggerated. The story changed from "kill everyone" to "take care of all y'all."[39] Deputy Barnes failed to interview other employees or ask to see the surveillance footage, which would have showed that Jonathan never actually said either of those things.

---

[38] Exhibit 15 at 12:56:51.
[39] Exhibit 15 at 12:55.

90.    Critically, Deputy Barnes never bothered to pin down what Jonathan said and to whom he said it despite receiving conflicting statements at the scene that did not match the 911 call. He also never bothered to determine if the 911 caller actually heard the alleged threats.

91.    Deputy Barnes never asked to review the easily available surveillance footage.

92.    Deputy Barnes failed to interview other employees – all of whom would have denied that there was a violent threat. For example, Deputy Barnes could have spoken to Meagan Ireton, an employee of FaithCo who was there when Jonathan was gathering his things. She contacted the Layton Family shortly after the incident and stated that Jonathan had not threatened anyone.[40]

> I just saw the news article and I'm so FKN angry they made him sound like a monster and Jonathan wouldn't hurt a fly. He was always saying crazy things but he doesn't mean it he just talks crazy when he's upset.  The news quoted him saying he was going home to get a gun and come back and kill everyone, but Helen told me that what he said was that he had something at home that would take care of all this.[41]

93.    Yet without talking to other employees like Helen or conducting any additional investigation *and knowing the 911 call was either false or greatly exaggerated*, Deputy Barnes states as he pulls out of FaithCo, "This Motherfucker! Something told me to stop that damn truck."[42]

---

[40] Exhibit 17, Witness, FaithCo incident, to Layton Family (November 5, 2024).
[41] *Id.*
[42] Exhibit 18, Braylon Barnes Body Worn Camera footage (November 5, 2024, at 13:00).

94.     Deputy Barnes then admitted on his body camera to a practice of illegally targeting what he perceives as working-class men with pickup trucks full of tools or scrap to pull over and harass.[43]

95.     At the same time Deputy Barnes is inappropriately calling Jonathan a "Motherfucker," Jonathan is still communicating with FaithCo employees by text.

96.     At 1:02 p.m., Jonathan texted a FaithCo supervisor,

>  Need my 3 orange straps that where and I don't care about the
>  broken handle hand pump and there were those 3 bottles of map gas
>  that was mine I want all that before I bring any of the uniforms
>  back.[44]

97.     There was no threat in this 1:02 PM communication.

98.     FaithCo never reported the 1:02 PM non-threatening text to Smith County.

99.     A minute later, Jonathan again texted Kelsie Denise, "They went through and took all the fittings that I had paid for myself. They said since I didn't have a receipt, they had to take them."[45]

100.    There was no threat in this 1:03 PM communication.

101.    FaithCo never reported the 1:03 PM non-threatening text to Smith County.

---

[43] *Id.*
[44] *See* Exhibit 19, Text Message from J. Layton, Tools and straps still at FaithCo, to JFaith Co Po Number (November 5, 2024 at 1:02PM).
[45] *See* Exhibit 20, Text Message J. Layton, "They went through and took all my fittings I paid for myself. They said since I didn't have a receipt they had to take them", to Kelse Denise (November 5, 2024 at 1:03PM).

PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY – Page 20

102.    Jonathan then texted Helen Thompson at FaithCo and apologized for his behavior at FaithCo that day – even though the video shows he had little reason to apologize, "Srry didn't mean to start all that crap u can delete my number if you want to."[46]

103.    There was no threat in this 1:05 PM communication.

104.    FaithCo never reported the 1:05 PM non-threatening text to Smith County.

105.    This was not a criminal matter. There was no need for law enforcement involvement. A properly trained and competent deputy responding to the 911 call would quickly have made that determination and reported it back to dispatch.

106.    A properly trained and competent deputy responding to the FaithCo 911 call would have informed other responding officers that the 911 call was false or extremely exaggerated and that no one had made any overt threat.

107.    Deputy Barnes, however, is not a properly trained or competent deputy; and importantly, the Smith County Sheriff's Office was consciously indifferent to this obvious fact.

108.    Based on the false 911 call and Deputy Barnes' failure to perform a competent investigation and report his findings, the Smith County Sheriff's Office dispatched Deputy Barnes and Deputy RJ Baran to the Layton residence where Jonathan lived with his widowed mother, Plaintiff Nancy Layton, and his brother Freddie Layton, Jr.

109.    Jonathan's final text message during his life on Earth with his mother and family was to another FaithCo employee, Kelsie Denise at 1:08 PM, again apologizing, "Don't say anything to them ok and Srry if it started anything."[47]

---

[46] *See* Exhibit 21, Text Message from J. Layton, Apology, to Helen Thompson (November 5, 2024, at 1:05PM).
[47] See Exhibit 22, Text Message from J. Layton, Apology, to Kelse Denise (November 5, 2024, at 1:08PM).

PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY – Page 21

110.   There was no threat in this 1:08 PM communications.

111.   FaithCo never reported the 1:08 PM non-threatening text to Smith County.

112.   This was never a matter requiring law enforcement involvement. There was never any threat or possibility of violence.

113.   Nevertheless, as Jonathan was typing this additional apology, Deputy Barnes was arriving at Jonathan's house.[48]

## **Deputy Barnes Kills Jonathan Layton**

114.   At 1:10 p.m. — almost half an hour after Jonathan had left FaithCo — Deputy Barnes pulls up to Jonathan's house. Deputy Baran arrived shortly thereafter. When Deputy Baran arrived, Deputy Barnes' body camera footage restarts.

115.   Deputy Barnes failed to inform Deputy Baran that the FaithCo employees were inconsistent in their story about Jonathan making an explicit threat of violence, but neither deputy expressed any concern about approaching the house.

116.   The conversation between Deputy Barnes and Deputy Baran is fully transcribed below:[49]

3      DEPUTY BARNES:  You pulled up just in

4      time, homie.

5      DEPUTY BARAN:  (Inaudible).

6      DEPUTY BARNES:  Yeah, man, apparently --

7      Tim called me, Tim Thompson called me and said he lives

8      with his mom, this crazy dude, because I passed that

---

[48] *Id.; See also* Exhibit 15, BODY WORN CAMERA Footage Braylon Barnes.
[49] Exhibit 23, Body Worn Camera Footage, BWL7-011558_Barnes_BWC, (November 5, 2024 at Layton Residence); Exhibit 24, Body Worn Camera Transcript of Deputy Barnes at 2:3-22; *See Generally* Exhibit 25, Body Worn Camera Transcript of Deputy Baran. (Deputy Baran did not turn on his body worn camera until they were at the door and did not capture this conversation).

9        place and I was like, man, they [FaithCo] probably saw me and

10       decided they wanted to call in. Well, before I even

11       passed them, I seen this truck and I was going to stop

12       it because it looked like shit, you know, but, anyway,

13       he was like, yeah, he was driving a white truck.

14    (Radio)

15    DEPUTY BARNES:  Apparently, he's made

16       comments about, yeah, I've got something that will fix

17       all of y'all or something like that so...

18    DEPUTY BARAN:  Damn.

19        (Knock on door)

20    DEPUTY BARNES:  Sheriff's Office.

21        (Dog barking)

117.    It is clear from this conversation that Deputy Barnes had no idea what Jonathan said at

FaithCo, made no attempt to properly investigate it, and did not seem to care.

118.    There is also no evidence of a call from Deputy Thompson. Notably, a half an hour of

footage from Deputy Barnes' body camera during his trip from FaithCo to the Layton residence is

missing or was deleted.  Turning off his body camera is a repeated pattern and practice of Deputy

Barnes. Over eighty videos from his previous job at Tyler PD had been deleted by Barnes to hide

violations of Tyler PD policies.[50]

119.    Two weeks later during his interview with Texas Rangers, Deputy Barnes used this gap in

footage to falsely claim that Deputy Thompson told him on a telephone call that Jonathan Layton

---

[50] See Exhibit 26, Tyler Police Department Internal Investigation of Braylon Barnes.

was "a bad guy."[51] This alleged conversation is missing or was deleted from Deputy Barnes' body camera video and does not appear on Deputy Thompson's body camera footage from that day.

120.    In none of the later body camera video at the scene from any of the officers from Lindale Police Department, the Smith County Sheriff's Office, or anyone else is there any discussion of Jonathan Layton being a "bad guy." There is audio of officers stating that they knew the family and knew Jonathan by his nickname, Cowboy.[52]

121.    Deputy Barnes also claimed during his later Texas Rangers interview that during the gap in his bodycam footage, he felt endangered by the situation and attempted to use his squad vehicle loudspeaker to ask Jonathan Layton to come outside, but the loudspeaker did not work. This was also a lie.[53]

122.    When Deputy Baran arrived and Deputy Barnes' footage restarts, Deputy Barnes did not mention to Deputy Baran that his squad car loudspeaker was not working or that he had tried to use it to contact the residents of the house.  He also did not ask Deputy Baran to try his vehicle's loudspeaker. There is no audio or video evidence of any apprehension by Deputy Barnes.

123.    Deputy Barnes continued lying after the incident that day and throughout subsequent investigations.  As shown below, this type of conduct is completely consistent with Deputy Barnes' character and past inappropriate, dishonest and unprofessional behavior, which were all well-known to the Smith County Sheriff's Office when they hired him and thereafter.

---

[51] Exhibit 27, Braylon Barnes, Texas Ranger Interview Transcript, November 14, 2024 at 7:6-20. ("He says, I know him, Braylon, and be careful, you know, he's dangerous and he's not all there, you know.").
[52] *See* Exhibit 28, Transcript of Axon_Body_3_2024-11-05_1315_Z60A6782U, Layton inside home body cam female at 12.
[53] *See Generally* Exhibit 23 and Exhibit 25.

124.    After this greeting, both deputies approached the house. Deputy Barnes knocked on the front door.

125.    Both deputies' vehicles were parked away from the Layton home and obscured by the Layton Family's vehicles and a box fan in the window.[54]

126.    The deputies' patrol units did not have their lights flashing.

127.    Deputy Barnes' knock caused the three dogs inside to start barking.[55]

128.    At the time of the knock, Jonathan Layton was sitting in his recliner in the back corner of the living room watching television. The sound of two televisions, multiple fans, and the three barking dogs prevented Freddie, Jr., Nancy, and Jonathan from hearing any announcements from Deputy Barnes.[56] Their inability to hear the announcement by Deputy Barnes has been confirmed by an audiology expert.[57]

129.    Deputy Baran did not announce himself.[58]

130.    Plaintiff Freddie Layton Jr. was in the bathroom when the deputies knocked. Freddie Jr. did not hear any announcement from Deputy Barnes or Deputy Baran.[59]

---

[54] Exhibit 29, Braylon Barnes, Texas Ranger Interview Transcript, November 14, 2024; Exhibit 30, Raj Baran, Texas Ranger Interview Transcript, November 14, 2024.
[55] Exhibit 23, Body Worn Camera Footage Deputy Barnes, BWL7-011558_Barnes_BWC (Layton Residence); Exhibit 31, Body Worn Camera Footage Deputy Baran, BWL7-011159_Baran_BWC; Exhibit 32, Sworn Statement of Freddie Layton Jr; Exhibit 34, Body Worn Camera Footage Sabrina Rogers, Rogers_BWL7-011652 at 31:00 (Deputy Rogers does a sweep of the house with a Lindale Constable and you can see there are two televisions on and at least five fans including one next to the television Jonathan was watching); Exhibit 35, Forensic Audio Report of Durand R. Begault Ph.D.
[56] *See generally* Sworn Statements of Freddie Layton, Jr. and Nancy Layton.
[57] Exhibit 35, Durand R. Begault Ph.D., Forensic Audiologist Report (April 21, 2025).
[58] *See* Exhibit 23; *See also* Exhibit 30.
[59] *Id*; *See generally* Sworn Statements of Freddie Layton Jr and Nancy Layton.

131.    Freddie Jr. went to the door while Jonathan remained seated in his recliner and Nancy Layton cooked Jonathan a bacon sandwich in the kitchen.[60]

132.    Nancy Layton did not hear any announcement from Deputy Baran. To Nancy, the knock sounded very light.[61]

133.    Deputy Baran had positioned himself approximately ten feet in front of the house standing on the sidewalk leading to the porch and facing the front door.

134.    Deputy Barnes stood to the left of the front door (facing the house) on the porch approximately eight feet from the doorway with his hands casually crossed over his belt.

135.    The door opens on the right side (facing the house), hinged on the left.

136.    As Freddie Jr. answered the door and stepped outside of the house onto the porch, the dogs kept barking.[62] Freddie Jr. closed the door behind himself to keep the dogs inside.

137.    While Freddie Jr. was outside on the porch with the door closed, Deputy Baran asked Freddie Jr. if "Mr. Layton" was home.

138.    Freddie Jr. asked which Mr. Layton. Deputy Baran responded by motioning toward Jonathan Layton's pickup truck and indicating that the owner of the truck was the "Mr. Layton" whom he was looking for.

139.    The body cameras show Freddie Layton Jr. talking to the deputies with the door closed.[63] Deputy Barnes maintained his casual position with his hands on his belt.

---

[60] *See* Exhibit 32, Sworn Statement of Freddie Layton Jr at 28:21-22.
[61] *See* Exhibit 23 at 13:14:37; *See also* Exhibit 31 at 13:14:37. ("Sounded like a little kid.")
[62] *See* Exhibit 23; Exhibit 31; Exhibit 32 at 24:25-25-4.
[63] *See* Exhibit 23 at 13:11:57-13:12:01.



*Exhibit 36, Frame Grabs and side by side for Body Worn Cameras of Barnes and Baran*

140.    No one in the house could hear this brief, few seconds long conversation through the closed front door with televisions, fans, barking dogs and the kitchen stove.[64].

141.    Not knowing that sheriff's deputies were outside, Jonathan Layton got up from his recliner and approached the closed door.

142.    Jonathan had been attempting to repair a lighted sight on his handgun for several days. When he went to the door, Jonathan carried the gun with him.

143.    As Jonathan approached the doorway, the gun was in his left hand so he could open the door with his dominant right hand.

144.    As Jonathan opened the door and stepped behind Freddie Jr. — still in his own home with the door ajar — he transitioned the handgun from his left to his right hand, but he always kept the barrel pointed downward against his thigh with his finger clearly off the trigger and extended down the barrel.

145.    When Jonathan was in the doorway, Freddie Jr., realizing he was not the "Mr. Layton" sought, moved backward at 13:12:**04** past Jonathan into the house.[65]

---

[64] *See* Forensic Audiologist Report.
[65] *See* Exhibit 23; *See also* Exhibit 31.



146.    With the door slightly ajar, Jonathan was then standing in the threshold of his home holding

the gun in his right hand down at his side, finger not within the trigger guard.



*Exhibit 37, Body Worn Camera Footage; BWL7-011558_Barnes_BWC at13:12:05-13:12:07.*

147.    Jonathan's thumb was not gripping the pistol either.

PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY – Page 28



148.    Jonathan was taken by surprise when he answered the door, not knowing Sheriff's deputies were there.

149.    At 13:12:**06** Deputy Baran ordered Jonathan to drop his weapon, drew his gun and aimed it at Jonathan Layton's chest.

150.    Deputy Barnes still had not drawn his weapon or noticed Jonathan's gun.



PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY – Page 29

151.     Jonathan looked between the two officers with an expression of surprise, not the "thousand-yard stare" as later falsely reported.[66]

152.     With a gun pointed at his chest, Jonathan's finger was ***off the trigger***. His right hand was relaxed, and the barrel was pointing down.[67]



*Exhibit 37, at13:12:05-13:12:07.*

153.     Jonathan never made any threatening gestures or statements.

154.     At 13:12:**07** Deputy Barnes, says "what you doing man" as he recklessly pulls his handgun, jerks the slide, and ejects a live round.[68] This action is another indication of Deputy Barnes' lack of professionalism and proper training.

---

[66] *See* Exhibit 31 at 13:12:06 (Jonathan's eyes are wide, eyebrows raised, and his mouth is open).
[67] *See* Exhibit 23; *See also* Exhibit 29; Exhibit 30; Exhibit 31.
[68] *Id.*

155.    Jonathan's finger was still off the trigger, outside the trigger guard, and pointing down the barrel as Deputy Barnes pulls out his weapon and loads a round. Jonathan's thumb is also extended down the barrel. Jonathan was not even gripping the gun, but merely letting it hang down by his side by three fingers on the handle.



*Exhibit 23 at 13:12:07.*

156.    At the same time Deputy Barnes draws his gun chambering a round, Jonathan is already turning around to comply with Deputy Baran's instruction to put his gun away. He is not looking at Deputy Barnes or Deputy Baran.



157.    Jonathan turned slowly and slightly to his right, which moved his handgun on the right side of his body _**away from the deputies**_. His other hand reached for the door handle. With Jonathan's back turned and the gun shielded from the deputies by his body, Deputy Barnes started recklessly firing shots at Jonathan.



158.    Deputy Barnes, without giving Jonathan time to comply with the order to put his gun down, fired four rounds, hitting Jonathan three times – _**twice in his left side and once in his back**_.[69]

159.    Deputy Barnes merely blurted out, "What are you doing, man" and then immediately fired four panicked shots at Jonathan and ran away.

160.    The body camera transcript is instructive as to Deputy Barnes' outrageous conduct:

    14    DEPUTY BARNES: **What are you doing, man?**

    15    DEPUTY BARAN:· [sic]

    16    [sic]

    17    (Gunfire)[70]

---

[69] _See_ Exhibit 38, Autopsy Report; _See_ Exhibit 39a-d, Donna Harper, Medical Illustrations, The Presentation Group; _See_ Exhibits 23 and 31, Body Worn Cam Footage of Deputy Barnes and Deputy Baran.

[70] Exhibit 36, Durand R. Begault Ph.D., Body Cam Footage Frame Extracts of Deputy Barnes and Deputy Baran; _See also Exhibit_ 25 Body Worn Camera Transcript Baran, page 2:13-25.

161.    **TWO SECONDS** – 13:12:06 to 13:12:08 — that is the time between Deputy Baran's order to drop the gun and Deputy Barnes shooting Jonathan. And at no time during those two seconds did Jonathan make any furtive or threatening gesture towards the deputies.  In fact, he was slowly retreating into the house to put the gun away with his finger outside the trigger guard and thumb off the grip.

162.    In the following photos, one can also see the exact moment Deputy Barnes' first bullet hits Jonathan's upper left arm.[71]



163.    The view from Deputy Baran's body camera shows that at the moment Deputy Barnes shot him, Jonathan was clearly going into his house to put away the gun.

164.    Jonathan's left hand was on the door handle and his body was turned away from the officers. The gun wasn't visible to the officers, and Jonathan was ***not*** looking at Deputy Barnes.

165.    In his recorded interview two weeks later, Barnes attempted to justify his unlawful and unjustified shooting of Jonathan by lying:

> I notice him starting to blade himself . . . I was looking at the gun because, you
>
> know, I was always taught that the hands are what kills you. [ . . . ] I notice a blading

---

[71] *See* Exhibit 25; *See also* Exhibit 36.

PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY – Page 33

in his body, but at that point I notice his trigger finger was actually inside the well and I could see that the gun starting to come up. So that's when I put shots in him . . . ."[72]

166.    Deputy Barnes was concerned about acting and sounding tough to the Texas Ranger interviewer while avoiding the fact that he shot an innocent man putting away a gun that he legally possessed in his own home. But the body camera footage and autopsy demonstrate that Deputy Barnes simply lied to protect himself.

167.    Jonathan had turned **_away from_** – not bladed towards – the deputies to go into the house and put the gun down. The gun was not visible, and Jonathan was not looking at the deputies.

168.    The substantial damage to Jonathan's body as described in the autopsy report demonstrates that Jonathan was turned away when Deputy Barnes "put shots in him."[73]

---

[72] Exhibit 29 at 10:12-11:3.
[73] Exhibit 39, Medical Illustration of injuries sustained by Jonathan Layton, the wounds are numbered from top to bottom, not in the order in which they were sustained. See also Exhibit 29 at 12:1-6 and 33:10-12.

PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY – Page 34



***Gun Shot Wound #1*** *An entrance gunshot wound of the upper **<u>left side</u>** of the chest is centered 10 inches below the top of the head and 6 inches left of the anterior midline. The wound has a 1/4 inch diameter defect with an up to 1/2 inch marginal abrasion, clockwise from 11 o'clock to 7 o'clock. The wound has a surrounding red-purple contusion that extends up to 1-1/4 inches, clockwise from 6 o'clock to 2 o'clock. The wound also has a 1/4 inch abrasion located 1/8 inch from the 9 o'clock margin. There is no soot or stippling on the skin. **<u>The bullet sequentially perforates the left clavicle, anterior left first rib, upper lobe of the left lung, grazes the anterior third thoracic vertebral body, and continues to perforate the upper lobe of the right lung, posterolateral right third rib and intercostal musculature, and penetrate the musculature of the right axilla</u>**.*

**<u>Gun Shot wound #2</u>** *An entrance gunshot wound of the **<u>lateral left upper arm</u>** is centered 21 inches below the top of the head and in the lateral midline of the left upper arm.  The  wound has a 1/2 x 3/8 inch defect with an up to 1/4 inch marginal*

abrasion, clockwise from 4 o'clock to 8 o'clock. There is no soot or stippling on the skin. The bullet sequentially perforates the musculature of the left upper arm. An exit gunshot wound of the medial left upper arm is centered 17-1/2 inches below the top of the head and 1-3/4 inches posterior to the medial midline of the left upper arm. The wound has a 1/4 x 1/4 inch defect with 1/4 inch marginal lacerations at 4 o'clock, 10 o'clock, and 12 o'clock. A re-entrance gunshot wound of the left axilla is centered 17 inches below the top of the head and 1-1/2 inches posterior to the left mid-axillary line. The wound has a 5/8 x 1/4 inch defect with an up to 3/16 inch marginal abrasion and contusion clockwise from 9 o'clock to 3 o'clock. There is no soot or stippling on the skin. ***The bullet sequentially perforates the lateral left sixth rib, lower lobe of the left lung, and impacts the lateral left aspect of the ninth thoracic vertebra.***

***Gun Shot Wound #3*** An entrance gunshot wound of the lower ***left side of the back*** is centered 26-1/2 inches below the top of the head and 3 inches left of the posterior midline. The wound has a 1/4 x 1/4 inch defect with an up to 1/8 inch marginal abrasion and contusion, clockwise from 6 o'clock to 12 o'clock. There is no soot or stippling on the skin. ***The bullet sequentially perforates the musculature of the lower left side of the back and posterior to the lumbar vertebra, and continues to perforate the right psoas muscle, inferior right lobe of the liver, lateral right eleventh intercostal musculature, and penetrates the musculature of the lateral right side of the abdomen.***[74]

---

[74] Exhibit 38, Jessica B. Dwyer et. al., Autopsy Report of Jonathan Layton, Southwestern Institute of Forensic Sciences (January 2, 2025); *See also* Exhibit 39, Medical Illustrations.

PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY – Page 36

*(Emphasis added).*



169.    The path of the bullets into the left side Jonathan's body further demonstrates that Deputy Barnes is a liar who shot Jonathan without reason or justification. The bullets entering Jonathan's left side and back while the gun was in his ***right-hand*** show that he had turned away and was going back into the house to put down the gun.

170.    Jonathan was not looking at Deputy Barnes or Deputy Baran and had his left hand on the doorknob. Jonathan's body was between the deputies and his right hand holding the gun still down at his side opposite Deputy Barnes. There was no threat, no danger. Deputy Barnes shot Jonathan without justification.

171.    Deputy Barnes murdered Jonathan Layton.

172.    Deputy Baran, in his subsequent interview with the Texas Rangers described the moment Deputy Barnes shot Jonathan in a way consistent with the evidence: "He starts to back in, he's closing the door, and that's when the shots were fired."[75]

---

[75] *See* Exhibit 30 at 5:10-18.

173.    Deputy Barnes' unjustified and reckless actions almost killed Freddie Layton, Jr. and Nancy Layton too.  Freddie Jr. was almost struck by all four of the shots fired into the house by Deputy Barnes. The fourth bullet hit the half wall, inches away from Freddie Layton, Jr. and ricocheted into the ceiling. [76]  Freddie Jr. was so close to being hit that he checked himself to make sure he had not been injured.[77] His mother standing next to him was also nearly shot.

174.    Deputy Barnes' reckless discharge and excessive, unreasonable use of deadly force put the lives of both Freddie Jr. and Nancy Layton at risk — an aggravated assault with a deadly weapon.

175.    Just after fatally shooting Jonathan, Deputy Barnes' body camera shows him inexplicably ***running away*** from the house. Deputy Baran, who was first to pull his gun, never fired a shot. And instead of running away, Deputy Baran immediately went to check Jonathan's status.



176.    Deputy Baran quickly entered the home and blocked Nancy from approaching her son, yelling at her to stay away as Jonathan reached out his hand to his mother.

---

[76] *See* Exhibit 40.
[77] Exhibit 32 at 29:1-6.

177.    As Jonathan lay on the ground with three bullet wounds, Deputy Baran's body camera recorded the following conversation:

18    DEPUTY BARAN:· 42, shots fired, shots

19    fired, suspect is down, shots fired.

20    NANCY LAYTON:· Jonathan.

21    FREDDIE LAYTON:· They shot him.

22    (inaudible).

23    JONATHAN LAYTON:· I didn't know.· I put

24    it down.

25    DEPUTY BARAN:· 42, EMS (inaudible).[78]

15    JONATHAN LAYTON:· I didn't know, mom.

16    NANCY LAYTON:· I know, son.

[Deputy Barnes returns to the house.]

17    DEPUTY BARNES:· Keep -- keep -- don't

18    move your hand.· Don't move, man.· Do not move.

19    JONATHAN LAYTON:· I won't, dude.· Why are

20    y'all even here?

21    (Dog barking)

22    DEPUTY BARNES:· Apparently you made

23    comments to your boss about coming back with something,

24    with a weapon.

[78] Exhibit 25, Body Worn Camera Transcript Baran, page 2:13-25.

25     JONATHAN LAYTON:· What?[79]

1     DEPUTY BARNES:· You just got fired and

·2     you made comments threatening your job.

·3      ·(Dog barking)

·4     JONATHAN LAYTON:· About what?

·5     NANCY LAYTON:· (On phone call) I can't

·6     come right now.

·7     JONATHAN LAYTON:· (Moaning)

·8      (Radio)

·9     JONATHAN LAYTON:· About what?[80]

11     DEPUTY BARAN:· Ma'am, he brought a gun to

12     us.

13     JONATHAN LAYTON:· I didn't know y'all

14     were out -- I didn't know --

15     NANCY LAYTON:· It sounded like a little

16     kid knocking on the door.

17     DEPUTY BARNES:· Did we not say "Sheriff's

18     Office" with the window open?

19     FREDDIE LAYTON:· No.

20     JONATHAN LAYTON:· No.

21     NANCY LAYTON:· I was in the kitchen. I

---

[79] Exhibit 42, Body Worn Camera Transcript Barnes, page 4:15-25.
[80] Exhibit 43, Body Worn Camera Transcript Barnes, page 5:1-9.

22    was in the kitchen.

23    JONATHAN LAYTON:· Mom, I can't breathe.

24    Mom, I can't breathe.[81]

178.    Jonathan continued reaching out for his mother to hold his hand, but Deputy Baran would

not allow her to approach. She had to watch from a distance while her son cried for her dying in a

pool of blood spreading across the floor.



*Exhibit 23 at 13:12:30.*

179.    Jonathan's lung wounds were extremely severe. He lost the ability to breathe, essentially

drowning in his blood. Jonathan lived for several minutes in agony as his mother and brother

watched.

180.    When the paramedics arrived Jonathan was unconscious with just a thready pulse. The

paramedics asked Deputy Barnes how many shots he fired. He said two.[82]

---

[81] Exhibit 25; Exhibit 44, Body Worn Camera Transcript Barnes, page 6:11-24.
[82] *Id.*

181.    Deputy Barnes' actions were objectively unreasonable, completely unprovoked, unexpected, and demonstrate Smith County's deliberate indifference to proper police training.

182.    Jonathon had a clearly established Second Amendment right to possess a firearm in his home. Any reasonable person is aware of a citizen's Second Amendment right to possess a firearm. Jonathan was complying with the instructions to put down his gun when Deputy Barnes unlawfully shot him.

**<u>Larry Smith Slanders and Defames Jonathan</u>**

183.    When Sheriff Larry Smith arrived at the scene of the fatal shooting, body cameras record his first words, "Is the bad guy down?"[83] At that point, Larry Smith had no idea who the bad guy was, and he did not care.

184.    Deputy Sabrina Rogers had already gathered Deputy Barnes and Deputy Baran and placed them in patrol units with their cameras off and instructed them to call their lawyers.[84]

185.    Sheriff Smith had time to receive both deputies' versions of the events. Deputy Baran would have explained to Sheriff Smith that both deputies were outside the house, and Jonathan was turning away from them and retreating into the house when Deputy Barnes shot him. Deputy Baran's story remained consistent and is backed up by the body camera footage.

186.    In his after-action interview nine days later, Deputy Baran told the truth: "He starts to back in, he's closing the door, and that's when the shots were fired."[85] There was no threat, no words, no suggestive motions. Jonathan was simply going back into the house to put away the gun – exactly as he tried to explain while he lay dying on his mother's floor.

---

[83] Exhibit 45 Body Worn Camera Footage of Deputy Sabrina Rogers.
[84] *Id.; see also* Exhibit 46*,* Body Cam Footage Transcript of Lindale Police Officer.
[85] *See* Exhibit 41; *See also* Exhibit 49.

PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY – Page 42

187.    Nevertheless, when approached by reporters at the scene on November 5, 2024, Larry Smith knowingly and intentionally repeated ***to the press*** the lies in the 911 call — that Jonathan told employees at FaithCo that he was "going to his residence to get a firearm and come back and do them harm."[86] None of that was true. The entire conversation with Jonathan at FaithCo was recorded, and Jonathan made no such threat.[87]  Larry Smith lied.


[88]

188.    Larry Smith falsely reported the killing of Jonathan Layton to the gathered press:

2· MALE NEWS REPORTER:· Larry, what can you ·

3· ·tell us about today? ·

4· · · · · · · · SHERIFF SMITH:· Okay.· About 1 -- 12:46 ·

5· ·p.m. today, deputies from Smith County Sheriff's Office ·

6· ·were dispatched to our location we're at here now ·

7· ·regarding a business from Lindale that called in and ·

8· ·said that a former employee that had just been ·

9· ·terminated was supposedly going to his residence to get

---

[86] *Id.*
[87] See Exhibit 11.
[88] *Id.*

10· ·a firearm and come back and do them harm.

11· · · · · · · · · Deputies responded rather quickly.· The

12· ·deputy -- one deputy remembered seeing the vehicle

13· ·fitting that person's description as he was approaching

14· ·the business.· He turned around and goes to the location

15· ·we're at here and saw the vehicle here as well.· He and

16· ·another deputy *entered the residence* at which time they

17· ·saw the person he was looking for who *turned around in*

*18· ·the hallway with that firearm*.

19· · · · · · · · · At that time, *deputies responded in kind*

20· ·and fired several shots and the subject went down.

21· ·Ambulance was called and obviously called for further

22· ·assistance.

*Page 2.*

9 ·MALE NEWS REPORTER:· So two officers.

10· ·What is their status right now?

11· · ·  SHERIFF SMITH:· They're still here

12· ·on-scene.· *I've talked to both of them.*· Both of them

13· ·are unharmed.· Only one officer shot.· There was no need

14· ·for the other one to shoot.· Shot at least three times

15· ·that I know of and he went down.· And, again, he was

16· ·transported by ambulance to the Christus Trinity Mother

17· ·Frances Hospital in -- here in Lindale where they

18· ·pronounced him deceased.

*Page 4.*

25· · MALE NEWS REPORTER:· Do you know how they

1· ·got access to the house?

2· · · · · SHERIFF SMITH:· I don't know, Alan, how

3· ·they got access to the house.· ***I'm sure they went in,***

***4· ·knowing he was in there getting a firearm***, very

5· ·cautiously.· But ***he was met in the hallway and as he was***

***6· ·turning in the hallway with the pistol in his hand*** is

7· ·when he got a shot.

8· · · MALE NEWS REPORTER:· Did he get a shot

9· ·off?

10· · · · ·SHERIFF   SMITH:·   No,   not   to   my   knowledge.

*Page 4-5.*

16· · · · · · · · · FEMALE NEWS REPORTER:· Okay.· So I think

17· ·I'm confused.· They met in downtown Lindale originally

18· ·is where they found him?

19· · · · · · · · SHERIFF SMITH:· No, no.· ***Everything I***

***20· ·said to start with is 100 percent accurate.*** The deputy

21· ·first responded to his place of employment where he was

22· ·terminated from to talk to the owner there.· That's when

23· ·the guy had just left there and said I have something to

24· ·take care of this situation.· They took it to mean he's

25· ·coming to get a firearm at his residence.· The deputies ·

1· ·respond then to the residence.· ***When they go in, make*** ·

2· ·***entry into the residence, he turns around in the hallway*** ·

3· ·***with a pistol.· And they don't wait for him to turn all*** ·

4· ·***the way around.· It's obvious what he was trying to do***. ·

5· · · · · · · · · FEMALE NEWS REPORTER:· I understand.· Was ·

6· ·there anyone else in the home at the time?· ·

7· · · · · · · · · SHERIFF SMITH:· The mother and I believe ·

8· ·a brother are there now.· Whether or not they were there ·

9· ·at the time or not -- I believe they were, but I'm not ·

10· ·positive.

*KLTV News, Transcript of Sheriff Smith Interview at Layton Residence*[89]

189.    As he was telling these outrageous lies to the press, Larry Smith assured them that he had spoken to both deputies and that everything he said was "100% accurate." However, Deputy Baran's story has remained consistent — Jonathan had turned to go back into the house — so Larry Smith either lied about speaking to Deputy Baran or lied about what he was told. There was also a bullet hole on the ***outside*** of the front door. There was no entering the residence, turning around in a hallway, or responding in kind. The body cameras show what happened, and reality bears no resemblance to Larry Smith's lies. Larry Smith's lies to the press were so extreme, so outrageous, and so beyond normal, reasonable law enforcement practices as to shock the conscious.

---

[89] *See* Exhibit 49, transcript of Larry Smith media interview ("Smith Transcript") at 2:2-22; 4:10-18; 4:25-5:10; 6:16-7:10.

PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY – Page 46

190.    All Larry Smith's statements were knowingly false and made maliciously to malign Jonathan Layton to the public and build in the public the false version of events that Larry Smith, the politician, wanted to sell.

191.    In response to Larry Smith's lies, the title of the news article on KLTV states, "Man fired from job fatally shot after turning gun on Smith County Deputies."

192.    It was outrageous and irresponsible to make off-the-cuff comments to the press about such a serious incident before any investigation had been completed and when all available evidence contradicted his statement.

193.    Larry Smith's only objective was to protect himself politically. He had no professional or legal duty to tell the press anything. The statements he made were gratuitous and personal and outside of any actions required by his official duties.

194.    The obvious evidence at the scene, such as the bullet hole penetrating the ***outside of the front door*** and the ***bullet wound to Jonathan's back*** demonstrates that Larry Smith's statements were false and that he knew they were false.

195.    If he felt compelled to say anything, Larry Smith had a substantial amount of additional evidence available to him that would have allowed him to make a truthful statement to the press.

196.    At the time he made a statement to KLTV, Larry Smith had access to body camera footage.

197.    At the time he made a statement to KLTV, Larry Smith had access to the surveillance footage at FaithCo.

198.    At the time he made a statement to KLTV, Larry Smith had access to FaithCo employees to interview.

199.    At the time he made a statement to KLTV, Larry Smith could have looked at the scene and seen a bullet hole in the front door of the Layton residence.

200.    But instead of simply saying that the matter was under investigation, Larry Smith decided to repeat FaithCo's slander of Jonathan Layton, lie about what happened at the Layton house, and do unimaginable harm to the Layton Family. It shocks the conscious for a sheriff to intentionally lie about an unlawful, deputy-involved shooting and slander the victim.

201.    As a direct and foreseeable result of Larry Smith's false statements to the press, the Layton Family had to endure weeks of horrible comments on social media and news headlines such as KLTV's, "Man fired from job fatally shot after turning gun on Smith County deputies."  A cursory investigation of the evidence available *at that time* demonstrates that this was *completely false*.

202.    This inaccurate version of events was spread throughout social media and local news outlets.  This included the local CBS affiliate which ran the banner, "Man Killed in Smith County deputy-involved shooting refused to drop his weapon." The story then goes on to state that Jonathan pointed his weapon at the deputies.  These news outlets were repeating and amplifying Larry Smith's lies.[90][91]

203.    Alternatively, Larry Smith's statements were an official action of the Smith County as the Fifth Circuit has held that in Texas, the county sheriff is the county's final policymaker in the area of law enforcement. *Turner v. Upton Cnty.*, 915 F.2d 133, 136 (5th Cir. 1990). Larry Smith's lies to the press were so egregious as to shock the conscious and violated the Plaintiffs' substantive due process rights under the Fourteenth Amendment to the United States Constitution.

---

[90] Zak Wellerman, REPORT: Man Killed in Smith County deputy-involved shooting refused to drop his weapon, https://www.cbs19.tv/article/news/local/report-man-killed-in-smith-county-deputy-involved-shooting-refused-drop-his-weapon/ (December 6, 2024).
[91] Rose City Emergency Media, DEPUTY INVOLVED SHOOTING @ 13200BLK CR 4109, SMITH COUNTY,  Facebook, https://www.facebook.com/share/p/1JNWyG1guJ/ (November 5, 2024); KYTX CBS19, Facebook, https://www.facebook.com/share/p/16J7qLbujn/ (December 6, 2024); Catch Up Mona, Tragic Incident, FACEBOOK,
https://www.facebook.com/share/p/1EEFaRTx6n/ (November 5, 2024).

## <u>Deputy Barnes Has a History of Violence and Disqualifying</u>
## <u>Behavior for a Law Enforcement Officer</u>

204.    Soon after Deputy Barnes murdered his brother, Jeremy Layton, who was a Lindale firefighter for twelve years, started hearing from friends who work for Smith County that Deputy Barnes had a history of violence and inappropriate behavior unbecoming of a law enforcement officer.

205.    Deputy Barnes had been disciplined by the Tyler PD and had the nickname of "Training Day" at the sheriff's office after the extremely violent character played by Denzel Washington in the movie of the same name.

206.    However, Deputy Barnes' issues pre-date even his troubles at Tyler PD and the Smith County Sheriff's Office.  Before Deputy Barnes began his career as a law enforcement officer, he was a training cadet at Fort Worth PD where he repeatedly failed the mental acuity exam. He was found to lack the intelligence to be a City of Forth Worth police officer.[92]

207.    Barnes then transferred to Tyler Junior College, where he continued to fail the academic portion of the Peace Officer Licensing courses.[93]



---

[92] *See* Exhibit 47; Smith County Personnel File of Braylon Barnes.
[93] *See* Exhibit 48, Tyler Police Department Personnel Records of Braylon Barnes.

208.    Deputy Barnes later managed to get hired by Tyler PD where he quickly racked up a long list of policy violations during his 2016-2018 tenure.

209.    Tyler PD had a policy that for any given traffic stop, an officer must give a written warning or ticket or make an arrest. Barnes would often make traffic stops without doing any of this, then characterize it as a "no-event" so that his body camera footage would be erased instead of archived. He had a pattern and practice of wrongly stopping and harassing citizens and then ensuring that there was no record of the stop.[94]

210.    A Tyler PD investigation of Deputy Barnes revealed a long history of these types of policy violations, including making improper stops in which he did not even gather the driver's information: "[W]hile investigating this incident of improper conduct, it was discovered that Officer Barnes had issued verbal warnings on numerous traffic stops and had not properly labeled several of his audio/video recordings of traffic contacts."[95]

211.    It is a violation of the Fourth Amendment of the United States Constitution for officers to simply pull over citizens without reasonable suspicion of criminal activity.

212.    Deputy Barnes' inappropriate and illegal behavior was observed by Officer Russ, who captured it all on his body camera as he observed Deputy Barnes make an inappropriate stop and fail to even gather the driver's personal information:[96]

| Officer Barnes: | Don't ever do what I do. Don't ever do what I just (unintellgible).' |
| Officer Russ: | I don't. I don't.  I like my job. . . . that was a two-minute traffic stop, that was a thirty second traffic stop.' |

---

[94] *See* Exhibit 48 at 10.
[95] *See* Exhibit 48 at page 10-17.
[96] *See* Exhibit 48 at 40-42.

Officer Barnes:        Dude I have those every night. Multiple.

213.    It was eventually found that Deputy Barnes was in violation of policy on ***eighty-three*** "N-29" responses, which are incidents where a person is detained who is not wanted and had no outstanding warrants.[97] These types of stops can be legally problematic from a Fourth Amendment standpoint so departments require them to be documented. When Officer Russ explained this to Deputy Barnes, he replied, "Putting fucking notes, what the fuck?"

214.    Deputy Barnes also frequently cursed at citizens and called them "nigga."[98]

215.    Deputy Barnes' history of unlawful stops at Tyler PD is especially troubling in light of his statements at FaithCo a few years later on November 5, 2024, that he usually pulls over men like Jonathan with junk in the back of their trucks when he sees them on the road. It is also revealing that several minutes of Deputy Barnes' November 5, 2024, body camera footage is missing when one discovers he had an extensive history of such behavior at Tyler PD.

216.    Illegal stops and detainments were not Deputy Barnes' only violations at Tyler PD. Deputy Barnes was also investigated for an excessive force incident on September 18, 2017.[99]

217.    It was found during this investigation that there were at least eleven other incidents in which Deputy Barnes was in violation of Tyler Police Department's policies during a ***one-month*** period of August 7, 2017, through September 18, 2017. ***Eleven violations in one month***.

---

[97] *See* Exhibit 48 at 42, Tyler Police Department Personnel Records of Braylon Barnes. ("I noticed Officer Russ and Barnes discussing Russ clearing a Welfare Concern Call they worked on an N-29. Officer Barnes questions Russ about adding notes when he cleared the call on an N-29. Officer Barnes says, 'Putting fucking notes, what the fuck?' Russ explained that you're supposed to put something in the notes when you clear a call on an N-29.").

[98] *See* Exhibit 48 at 12.

[99] *Id.* at 11-49.

218.    Deputy Barnes was recommended for termination by two out of three of the investigators, one of whom was his immediate supervisor.[100]

219.    Tyler PD suspended Deputy Barnes without pay on December 15, 2017.  On December 23, 2017, Deputy Barnes gave his notice of resignation and moved on to the Smith County Sheriff's Office, where this type of officer is tolerated. [101]

220.    Despite being unable to pass the academic requirements of the Fort Worth PD and the Tyler Junior College Peace Officer courses then racking up dozens of illegal stops and other violations at Tyler PD, the Smith County Sheriff's Office hired Deputy Barnes. This is part of a pattern and practice of conscious indifference to safety and welfare of the citizens of Smith County in Smith County's hiring and training practices.

221.    Prior to and after SB 1445, the Smith County Sheriff's Office maintained a policy and practice of deliberate indifference to officer histories when it hires "gypsy police officers" who have been run off from other police agencies for various forms of misconduct.

222.    The Smith County Sheriff's Office obtained Deputy Barnes' employment file from Tyler PD but ignored Deputy Barnes' past issues and put him on the force without a performance improvement plan, psychological evaluation, or remedial training. Deputy Barnes is an example of Smith County's deliberate indifference to public safety.[102]

223.    Less than one week after being suspended without pay from the Tyler PD and recommended for termination by his supervisor after an in-house Tyler PD investigation, Deputy

---

[100] *Id.* at 11,47 and 49.
[101] *See* Exhibit 48 at 12.
[102] Exhibit 47, Smith County Sheriff's Officer Personnel Records, Braylon Barnes.

Barnes lied on his applications to Smith County Sheriff's office and claimed that he had never been subject to an in-house investigation.[103]

| 14. Have you ever been notified in any form by any law enforcement or corrections agency that you were the subject of an in-house investigation, be it criminal, civil, or administrative? |
| --- |
| ⊙ YES    ⊙ NO |

224.    Smith County had Barnes' employment records from Tyler PD. Even a cursory review of these records – or a phone call to Tyler PD – would have shown that not only was Barnes a danger to Smith County citizens, but also that he lied on his application to become a Smith County sheriff's deputy. Deputy Barnes is clearly unfit to be a law enforcement officer.

225.    This deliberate indifference was a direct and proximate cause of Jonathan Layton's death. The Smith County Sheriff's Office dispatched a deputy with a known history of excessive violence, proven dishonesty, and a long history of repeated Fourth Amendment violations to the Layton residence.

226.    Smith County, however, did not merely have Deputy Barnes' history of incompetence and inappropriate behavior at Fort Worth PD and Tyler PD as a warning, Deputy Barnes quickly showed the Smith County Sheriff's Office his unsuitability for law enforcement first-hand.

227.    Deputy Barnes began his tenure with the Smith County Sheriff's Office as a detention deputy and a courthouse deputy. Within the first six months of being hired by the Smith County Sheriff's Office, Deputy Barnes had already assaulted a local attorney, Jim Huggler, Jr., while he was going through security. On June 28, 2018, Deputy Barnes grabbed Mr. Huggler by the wrist and made unprofessional comments to him.[104]

---

[103] Exhibit 47 at 18. (Despite being subject to an Internal Affairs Investigation and put on suspension without pay, Barnes said he had never been subject to such on his application.)
[104] Exhibit 47 at 131-137.

228.    In his statement on the matter, Mr. Huggler noted that this was not the first negative interaction he had had with Deputy Barnes. Mr. Huggler stated he actively tried to avoid using specific entrances when Deputy Barnes was manning them.

229.    It is hard to imagine a more serious red flag than a deputy assaulting an officer of the court when going through security.

230.    Deputy Barnes' violations were not limited. Over the course of five months from December 15, 2021, until April 21, 2022, Deputy Barnes engaged in inappropriate contacts with a female suspect whom he placed in custody and incarcerated for aggravated assault with a deadly weapon. Deputy Barnes tried to have an extramarital affair with a suspect whom he had arrested.[105]

231.    After the investigation of Deputy Barnes essentially having inappropriate contact and communications with a female suspect charged with aggravated assault, he was placed on unpaid leave for three days and disciplinary probation for six months. The Smith County Sheriff's Office also required him to take an ethics course.

232.    There is more. On or about November 18, 2023, Deputy Barnes had a complaint lobbied against him for "no probable cause for a traffic stop, false arrest and falsifying his statements in his case report".  In light of his long history of these exact same Fourth Amendment violations – *at least 84 documented violations* – at Tyler PD that resulted in recommendations that he be terminated, Smith County did essentially nothing. While the Smith County investigators agreed that there was no probable cause for the stop, Deputy Barnes again kept his job.

233.    It is clear from Deputy Barnes' history that he is unfit for law enforcement. He was dismissed from Fort Worth PD due to low intelligence and essentially fired from Tyler PD. The Smith County Sheriff's Office ignored his history of policy violations, excessive violence, lying

---

[105] Exhibit 47 at 115-116, 158-172.

on his employment application (a crime in Texas) and complete disregard for the Fourth Amendment rights of citizens. Smith County and Larry Smith's deliberate indifference to Deputy Barnes' repeated policy violations, lying, incompetence, violence, and violations of citizens' Fourth Amendment rights was a direct and proximate cause of Jonathan Layton's death.

234.    However, in addition to ignoring his terrible past, Smith County and Sheriff Smith also failed to properly train Deputy Barnes.

235.    TCOLE has set mandatory training cycles for law enforcement officers in Texas. The bulk of Deputy Barnes' training is in gangs and narcotics. Sheriff's deputies patrol rural East Texas countryside.

236.    During this training cycle, Deputy Barnes took a 40-hour course in Terrorism and Homeland Security to finish his requirements. He did not train on firearms, de-escalation techniques (for example Course #1849), or crisis intervention (for example Course #3843 or #1850). Deputy Barnes did not undergo any training at all in 2024.

237.    Deputy Barnes was not trained for the job Smith County assigned him.

238.    Properly trained law enforcement officers are trained for encounters with armed citizens and know that an officer may not use deadly force in response to a citizen legally possessing a handgun in his own home as allowed by the Second Amendment to the United States Constitution.

239.    The body camera evidence objectively establishes that Jonathan made no threats to the deputies and was merely holding the gun down by his side with his finger off the trigger and turning to *go inside his own home* at the time Deputy Barnes fired four hasty and reckless shots at Jonathan.

240.    The lack of training, supervision and discipline for prior misconduct proximately led to the following:

a.    Deputy Barnes' failure to interview employees at FaithCo to verify the 911 call facts;

b.    Deputy Barnes' failure to clarify precisely what Jonathan said;

c.    Deputy Barnes' failure to report his findings back to the Sheriff's office;

d.    Deputy Barnes' decision to go to the Layton family home;

e.    Deputy Barnes' failure to properly handle a firearm;

f.    Deputy Barnes' failure to understand well-established Constitutional rights of citizens;

g.    Deputy Barnes's objectively unreasonable use of deadly force;

h.    Deputy Barnes' failure to understand the proper use of deadly force; and

i.    Deputy Barnes recklessly firing four wild rounds into an occupied residence.

241.    All these failures are due to Smith County's deliberate indifference to proper hiring, training, disciplining and supervising of its deputies. These policies of not providing proper training and supervision "contributed to the causal force behind the constitutional deprivation suffered by [Jonathan Layton]." *Brown v. Bryan County*, 219 F.3d 450, 465 (5th Cir. 2000).

242.    Deputy Barnes referring to Jonathan as a "motherfucker" before he had ever seen or spoken to Jonathan or investigated the facts indicated his lack of professionalism consistent with his past behavior that was well-known to Sheriff Smith and the Smith County Sheriff's Office.

243.    Deputy Barnes' poor skill at using a firearm is particularly alarming.

244.    Deputy Barnes recklessly expelled a live round before firing four rounds into an occupied house and nearly killing Freddie Layton Jr. and Nancy Layton along with Jonathan Layton.

245.    One of Deputy Barnes' bullets hit the half wall in the entry and ricocheted into the ceiling. The ricochet off the half-wall was inches away from hitting Freddie Layton Jr., an innocent bystander, in the head.

246.    This erratic behavior demonstrates the Smith County Sheriff's Office's deliberate indifference to the lives of the citizens of East Texas to send such a poorly trained, dishonest and incompetent deputy out into the community.

247.    The Smith County Sheriff's Office and Sheriff Smith were dismissive and unconcerned with Deputy Barnes' history of disobeying the rules, lack of relevant and appropriate training, unethical behavior, lying on his employment application (a crime in Texas), assaulting lawyers and tendency towards violence. They failed to remove him from patrol or provide proper remedial training.  This failure shows deliberate indifference to public safety and directly contributed to Deputy Barnes' excessive use of deadly force and unjustified killing of Jonathan Layton on November 5, 2024.

248.    Sheriff Smith and the Smith County Sheriff's Office certainly heard Deputy Baran's version of events at the scene, and knowing Deputy Barnes' history, they immediately knew they had a problem.

249.    Therefore, the cover-up and slander of Jonathan Layton started immediately.

250.    Deputy Sabrina Rogers arrived shortly after the shooting and placed Deputy Barnes and Deputy Baran in patrol cruisers and instructed them to turn off their body cameras and call their lawyers.

251.    The body camera of a rookie Lindale policeman caught a glimpse of Deputy Barnes shaking as a more senior officer explained to the rookie that it was Lindale PD policy to keep body camera footage rolling until the Texas Rangers show up to investigate.

252.    No sooner had she received this instruction to wait for the Rangers than a detective from the Sheriff's office ordered everyone – including Lindale PD – to turn off their body cameras despite the Texas Rangers having not yet arrived. Smith County Sheriff's Office knew this was a bad shooting even as Sheriff Smith was repeating his lies to the television cameras.  The Sheriff's Department did not want any more comments about "Training Day" killing "Cowboy" being caught on body camera.

### FIRST CAUSE OF ACTION:  42 U.S.C. § 1983 – Excessive Force in Violation of the Fourth Amendment

### (As to Defendant Deputy Barnes)

253.    As a direct and proximate result of the actions of Deputy Barnes acting under color of state law as a Smith County Deputy Sheriff, Jonathan Layton was deprived of his life without due process in violation of the Fourth and Fourteenth Amendment of the United States Constitution.

254.    The actions of Deputy Barnes were objectively unreasonable, grossly negligent, reckless, and constituted the use of excessive force and deliberate indifference to life because there was no immediate threat of harm when Jonathan Layton appeared at the door of his own home with a firearm by his side, which was well within his rights guaranteed under the Second Amendment of the United States Constitution. Deputy Barnes shot and killed Jonathan Layton without any rational justification as he was retreating into his home to put away his gun.

255.    Any reasonable officer in Deputy Barnes's position would be aware that his actions were unlawful. Any reasonable officer would be aware that he cannot use deadly force against a citizen for exercising his clearly established Second Amendment right to possess a firearm in his own home.

256.    At all times relevant to this Complaint, Deputy Barnes was acting under the direction and control of Defendant Sheriff Smith and was acting pursuant to the official policies, customs, and

practices of the Smith County Sheriff's Office when he killed Jonathan Layton. Defendant Sheriff Smith explicitly approved of and ratified Deputy Barnes' killing of Jonathan Layton when he appeared at the scene:

  2   SHERIFF SMITH:· They're fully employed,

·3· ·will remain employed.· They did -- did it by the book.

·4· ·Did what had to be done.· Not what anybody wants to do,

·5· ·obviously, but when they needed to do it, they practice

·6· ·what they were trained to do and they probably saved

·7· ·some lives by doing so.[106]

---

[106] Exhibit 49, Smith Transcript at 8:2-7.

**SECOND CAUSE OF ACTION:  42 U.S.C § 1983 – Policy and Practice of Hiring Dangerous Deputies**

**(As to Defendant Smith County, Texas and Larry Smith)**

257.    Sheriff Larry Smith is the final policy maker for the Smith County Sheriff's Office and is responsible for the hiring, training, and supervising deputy sheriffs.

258.    Deputy Barnes repeatedly failed the Fort Worth Police Department's mental acuity exam. He was forced to resign from the Tyler Police Department for use of excessive force, unprofessional behavior, and **over eighty** documented violations of citizens' Fourth Amendment rights not to be unlawfully detained. Deputy Barnes lied on his employment application to the Smith County Sheriff's Department, and that lie was easily discoverable by even a cursory review of his Tyler Police Department personnel file.

259.    Deputy Barnes' shocking employment record and his criminal, sociopathic, dishonest, and unprofessional behaviors were well known within the Smith County Sheriff's Office both before and after he was hired. As a Deputy Sheriff, Deputy Barnes assaulted an officer of the court, used excessive force, continued making inappropriate stops of citizens, and tried to have an extramarital affair with a female suspect whom he had arrested. Other deputies referred to Deputy Barnes as "Training Day" because of his history of violence, his thuggish demeanor such as cussing at citizens and calling them "Niggas," and his custom of wearing his badge on a chain around his neck like Denzel Washington's extremely violent character in the movie.

260.    Prior to and after SB 1445, the Smith County Sheriff's Office has had a policy and practice of deliberate indifference to officers' histories when it hires "gypsy police" running from problems and puts them on the force without an appropriate performance improvement plan or remedial training. This policy and practice of reckless hiring of "gypsy police" was a direct, proximate, and

foreseeable cause of Deputy Barnes' unlawful killing of Jonathan Layton in violation of the Fourth and Fourteenth Amendment.

261.    A mere week after being suspended without pay from Tyler PD after an in-house investigation, Deputy Barnes joined the Smith County Sheriff's office stating on his application that he had never been the subject of an in-house investigation.  Smith County had access to Deputy Barnes's employment file from Tyler PD and could have examined his history. These reckless hiring practices demonstrate deliberate indifference to health, safety, welfare, and Constitutional rights of Smith County citizens and were a direct and proximate cause of Jonathan Layton's death.

262.    It was obvious from his violent record at Tyler PD that Deputy Barnes was "highly likely to inflict the particular injury" suffered by Jonathan Layton. Deputy Barnes' use of excessive force was a plainly obvious consequence of Larry Smith's decision to hire him.

263.    Smith County Sheriff's Office dispatched a deputy with a known history of excessive violence to the Layton residence for nothing more than what any competent law enforcement officer conducting a reasonable investigation would have concluded was a minor civil dispute.

264.    These established hiring practices constitute deliberate indifference to the safety of Smith County citizens and were a direct, foreseeable, proximate cause of Deputy Barnes killing Jeremy Layton despite Constitutionally protected, non-threatening possession of a handgun in his own home and therefore, depriving Jonathan Layton of his life without due process guaranteed by the Fourth and Fourteenth Amendment of the United States Constitution.

## THIRD CAUSE OF ACTION:  42 U.S.C. § 1983 – Failure to Train and Supervise
## (As to Defendant Smith County, Texas and Sheriff Larry Smith)

265.    Sheriff Larry Smith is responsible for training and supervision and protocol for use of force, use of deadly force, and forcefully entering a home.

266.    Due to their failure to supervise Barnes to ensure a proper investigation of the 911 call, the Smith County Sheriff's Office sent two deputies to the Layton home without probable cause, without a warrant, and without the report of any actual crime.

267.    Once Deputy Barnes arrived at FaithCo, he heard inconsistent statements about the alleged threat reported to 911. Nevertheless, due to Deputy Barnes' lack of training and supervision, he did not follow up with a proper investigation and report his findings back to the department or the other responding officer at the scene.

268.    Because there was never any threat of violence, the unsuspecting Laytons had no idea why the deputies showed up at their house. This is why Jonathan Layton asked Deputy Baran after he had been shot why the deputies were there.

269.    Jonathan went from watching television while waiting for his mother to finish making him a bacon sandwich to lying on the floor bleeding to death with shattered bones and organs.

270.    Instead of interviewing other employees at FaithCo or looking at the available FaithCo surveillance footage, Deputy Barnes rushed to confront "the motherfucker" that he thought he should have pulled over and harassed for simply having junk in the bed of his truck.

271.    Sheriff Smith and Smith County completely failed to supervise Deputy Barnes on his incompetent investigation that day despite what was at first falsely reported as a serious threat on the 911 call. This failure to properly supervise constituted deliberate indifference to the life and safety of the Layton Family.

272.    There was no time-sensitivity to the 911 call.  Deputy Barnes had time to investigate the facts, including reviewing the 911 call notes and asking the caller follow-up questions.  Deputy Barnes had plenty of time and opportunity to fully investigate the facts by interviewing all FaithCo employee witnesses. The lack of supervision led to a rush to get involved and massively escalate what clearly was not a matter for law enforcement.

273.    Such investigation of someone who allegedly made threats as falsely reported on the 911 call may have also included reviewing Jonathan's recent social media, such as these Facebook posts: "I never fake my care to anyone. What I give, I give from the heart"[107] or "There's nothing like a hug to get you through the day. So I'm sending a great one your way!!!"[108] Or maybe they could have assessed the danger from a post such as this one: "When all else fails just take a nap."[109]

274.    The investigator may have noticed that Jonathan liked to make posts featuring Winnie the Pooh.  Many of his posts were about missing his deceased father such as: "My dad in heaven watching me push through the pain of missing him to make him proud." Jonathan was not a dangerous "motherfucker" who needed a clearly unstable and armed "Training Day" banging on his front door.

275.    As noted by one of Jonathan's co-workers whom Deputy Barnes failed to interview that day, "Jonathan wouldn't hurt a fly."[110] A competent, properly trained, and properly supervised deputy would have interviewed her and other employees like her before going to the Layton home.

---

[107] Jonathan Layton, FACEBOOK, https://www.facebook.com/jonathan.layton.98 (April 26, 2023).
[108] Jonathan Layton, FACEBOOK, https://www.facebook.com/jonathan.layton.98 (March 24, 2023).
[109] Jonathan Layton, FACEBOOK, https://www.facebook.com/jonathan.layton.98 (March 21, 2023).
[110] *See* Exhibit 17.

276.    According to Larry Smith, when Deputy Barnes fired four reckless shots at Jonathan while he was retreating into an occupied house to put away his gun, Deputy Barnes "practiced what he was trained to do."[111] It is unlikely that Larry Smith had any idea what relevant training Deputy Barnes had undergone when he made that recklessly false statement to the press, and as it turns out, it was basically none.

277.    The Smith County Sheriff's Office has an affirmative duty to train its deputies on de-escalation, the use of deadly force, and to be able to recognize what is and what is not a deadly threat. "This need for [use of deadly force] training is so obvious that the failure to train is deliberate indifference to constitutional rights." *City of Canton v. Harris*, 498 U.S. 378, 390 (1989). Deputy Barnes lacked recent training in these areas despite a history of violence.

278.    It is common for law enforcement in East Texas – especially sheriff deputies patrolling rural areas – to encounter armed citizens exercising their Second Amendment rights. Failing to "train [] employees to handle such recurring situations presents an obvious potential for [excessive force] violations." *Id*. at 409.

279.    The mere possession of a firearm is not a deadly threat – it is a constitutionally protected right. It is deliberate indifference to the lives of its citizens for an East Texas Sheriff's Office to fail to train its deputies on de-escalation when a deputy encounters a citizen with a firearm. In fact, this is one of the first lessons given by experienced officers in East Texas when a new officer joins the force.

280.    The Smith County Sheriff's Office allowed Deputy Barnes to fulfill his ongoing training requirements with courses focused on Homeland Security instead of courses more appropriate and needed by an East Texas sheriff's deputy: firearms training, de-escalation training and appropriate

---

[111] Smith Transcript at 8:2-7.

use of force. This is more shocking considering Deputy Barnes' history – including recent history of assaulting a Smith County attorney as he tried to enter the courthouse.

281.    This policy and practice of failing to require de-escalation training was deliberate indifference to the safety of Smith County citizens and a direct, foreseeable, proximate cause of Deputy Barnes killing Jonathan Layton, despite non-threatening possession of a handgun, and therefore, depriving Jonathan Layton of his life without due process guaranteed by the Fourth and Fourteenth Amendment of the United States Constitution.

282.    "[I]t should have been obvious to [Larry Smith] that the highly predictable consequence of not training [Barnes] was that [Barnes] would apply force in such a way that the Fourth Amendment rights of the citizens of [Smith] County were at risk [and that] this failure to train or to provide supervision was 'the moving force' that had a specific causal connection to" Jonathan Layton's death. *Brown*, 219 F.3d at 461.

283.    Deputy Barnes' unprofessional behavior in killing Jonathon Layton falls squarely on the Smith County Sheriff's Office.  Deputy Barnes' shocking behavior was proximately and directly caused by the deliberate indifference to proper training and supervision by Larry Smith and the Smith County Sheriff's Office.

### FOURTH CAUSE OF ACTION:  Texas State Law Claim for
### Intentional Infliction of Emotional Distress
### (FaithCo and Taylor Tracy)

284.    At all relevant times, Taylor Tracy was an agent for Defendant FaithCo, acting within the course and scope of his employment.

285.    Taylor Tracy's false 911 call that Jonathan Layton had threatened to go home, get a gun, and come back and kill everyone was extreme and outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, as to be regarded as atrocious and utterly

intolerable in a civilized community. In fact, these actions constitute a third-degree felony in the State of Texas.

286.    The conduct was outrageous because it was foreseeable and intended to result in law enforcement being dispatched to the Layton home.  In fact, when Deputy Barnes arrived at FaithCo, he was given a piece of paper with Jonathan's home address pre-written on it. FaithCo wanted a confrontation between ex-employee (and wrongfully terminated) Jonathan Layton and armed law enforcement.

287.    The conduct is even more outrageous because one of the last things Jonathan was told as he was leaving FaithCo was to ***come back*** soon and return his uniforms.[112] No one at FaithCo was afraid of Jonathan.

288.    Even more alarming, as FaithCo was sending deputies to his house, Jonathan was texting two employees at FaithCo ***apologizing*** if he had made a scene when he came to get his tools.[113]

289.    Further, as shown by Jonathan's text messages after he left FaithCo, the only "threat" that Jonathan made related to his wrongful termination was to withhold his uniforms until FaithCo gave him the fittings he had paid for.

290.    Sending deputies to Jonathan's house based on the false report of a crime was a premeditated plan to use the deputies to harass and intimidate Jonathan which resulted in the violations of TEX. PENAL CODE § 42.0601.

291.    These actions were also maliciously intended to slander Jonathan Layton and harm his reputation to manufacture cause to terminate him and avoid having to provide him with light duty or worker's compensation benefits while he recovered from his hernia injury.

---

[112] *See* Exhibit 1 at 2, termination letter signed by Taylor Tracy; *See* Exhibits 21 and 22.
[113] *Id*.

292.    FaithCo's conduct proximately caused the Plaintiffs damage in that it caused the Plaintiffs to suffer severe emotional distress. Defendant Tracy's conduct was the direct and proximate cause of Jonathan Layton being shot dead by a Smith County sheriff's deputy in his mother's home and bleeding out and dying on the floor of that home, right in front of his mother and brother.

293.    Jonathan Layton suffered horrible pain and suffered emotional distress as he was shot and lay dying on the floor pleading for his mother to hold his hand.

294.    Plaintiffs Nancy Layton and Freddie Layton Jr. have suffered severe emotional distress resulting in numerous, intense headaches, inability to sleep at night, inability to enjoy or digest food, and overwhelming feelings of anxiety, nervousness, and sorrow consistent with post-traumatic stress disorder. Both are suffering severe post-traumatic stress as a result of their son and brother's murder.

295.    Nancy Layton's emotional trauma is so severe from seeing her son shot three times and then bleeding on the floor of her home begging her to hold his hand while Deputy Baran prevented her from comforting her son that she is now having difficulty with basic life functions as preparing food, eating, dressing, and bathing.

296.    In addition to severe emotional distress, the Plaintiffs have suffered and will continue to suffer additional damages as a proximate result of FaithCo's conduct in that, in all reasonable probability, they will continue to suffer this mental pain and anguish for the remainder of their lives. Freddie, Jr. is haunted by having to clean up the blood and gore from the floor where Jonathan lay dying.



**FIFTH CAUSE OF ACTION:  Texas State Law Claim for Slander**

**(FaithCo and Larry Smith Personally)**

297.    At all times relevant to this Complaint, Taylor Tracy was an officer of FaithCo acting in the course and scope of his employment.

298.    FaithCo called Smith County 911 and stated that Jonathan Layton had threatened to go home, get a gun, and come back and "kill us all."

299.    These defamatory statements constitute defamation ***per se*** because they suggested that Jonathan Layton was guilty of criminal activity.

300.    The 911 call falsely reporting a crime also constituted a third-degree felony in Texas punishable by two to ten years in state prison and a fine of up to $10,000.

301.    These defamatory statements were false, and statements from several witnesses and the security footage from FaithCo prove that they were false.

302.    Taylor Tracy made these statements with actual malice with the intent to manufacture grounds to fire Jonathan Layton after he revealed that he was planning to speak to an attorney regarding his termination and a potential worker's compensation claim.  FaithCo did not want to provide Jonathan Layton light duty work or worker's compensation benefits, and so Defendant

Tracy maliciously slandered him to the Smith County Sheriff's Office with the specific intent to harm and intimidate him into not filing a lawsuit for wrongful termination.

303.   The Plaintiffs also make this slander complaint against Larry Smith personally. Smith repeatedly lied to the press about what happened on November 5, 2024, at the Layton's house.  He lied to the press about Jonathon making threats at FaithCo and he lied that Jonathon threatened the deputies with a gun.  He lied that the deputies responded "in kind."

304.   These lies were told with deliberate indifference to the truth because the evidence was available to Smith at the time he made the false statements to the press.

305.   These defamatory statements were false, and statements from several witnesses, the security footage from FaithCo, the deputies' body camera footage, and the physical evidence from the scene prove that they were false.

306.   Smith's statements were made with actual malice because he was intentionally trying to harm the Layton Family to cover up Deputy Barnes' unlawful killing of Jonathon Layton and to protect himself politically.

307.   There was no need or legal duty for Smith to give these statements to the press.  His official capacity did not require him to approach reporters and simply make up facts that he thought would aid him politically.

308.   Smith's statements were made gratuitously and were not part of his official duties.

309.   Smith's statements to the press at the Layton home on November 5, 2024, were not made in any official meeting of any governmental agency or office.

310.   Smith's extreme and outrageous comments take his actions outside his official capacity, and he should be held accountable for the intentional and foreseeable harm he did to the Layton Family during an unimaginably tragic time in their lives.

311.    Alternatively, as sheriff, Larry Smith is responsible for setting official policy of Smith County related to law enforcement. As such, his statements to the press were so outside normal acceptable law enforcement practice of reserving comment pending an investigation as to "shock the conscious." To make knowingly false statements to the press to maliciously slander the victim of excessive deadly force at the scene of the incident is so extreme and outrageous it shocks the conscious and constitutes a violation of Jonathan Layton's and his family's substantive due process rights under the Fourteenth Amendment to the United States Constitution. Larry Smith's actions were cruel, completely unnecessary, and "repugnant to the conscious of mankind." *Hudson v. McMillan*, 503 U.S. 1, 19 (1992).

### SIXTH CAUSE OF ACTION:  Texas State Law Claim for Discrimination and Retaliation in the Termination of Jonathan Layton

### (FaithCo)

312.    Taylor Tracy on behalf of FaithCo illegally terminated Jonathan under a false pretext in retaliation for Jonathan inquiring about workers' compensation coverage and mentioning to another FaithCo employee that he was seeking the advice of an attorney.

313.    Jonathan Layton was an employee of FaithCo, and FaithCo is a subscriber under the Texas Workers' Compensation Act.

314.    FaithCo illegally fired Jonathan in retaliation for asserting his rights, seeking a lawyer to help him file a claim, and seeking workers' compensation under Texas Labor Code §451.001.

315.    Furthermore, Jonathan Layton was eligible for job-protected leave for his work-related injury under the Americans with Disabilities Act and Family and Medical Leave Act.

316.    In September of 2024, Jonathan Layton was injured while on the job.

317.    This injury resulted in a double hernia that required surgery.

318.    Jonathan was ordered by his doctor to take time off work so that his injuries could heal after surgery.

319.    Taylor Tracy was aware that Jonathan was injured on the job and that he had inquired about workers' compensation coverage.

320.    As a pretext for firing Jonathan in retaliation for inquiring about workers' compensation and seeking advice from a lawyer, Defendant Tracy fired Jonathan for "failure to comply with FaithCo's Harassment Policy" with regard private, reciprocal, and consensual texts with a former sex shop worker employed at FaithCo. Defendant Tracy had allegedly discovered this text on October 25 – the day after Jonathan texted another co-worker that he was seeking legal counsel.

321.    However, all of Jonathan's communications with this co-worker were consensual, and the female FaithCo employee had sent Jonathan nude photos of herself. This female employee was not terminated, which demonstrates that Jonathan would not have been fired but for his on-the-job injury, inquiry into workers' compensation coverage, and comments that he was seeking legal counsel.

322.    As Jonathan was leaving FaithCo on November 5, 2024, Taylor Tracy used an off-handed comment related to a minor disagreement over ownership of a few pipe fittings to create an additional false pretext to fire Jonathan.  Jonathan's comment that he had something at home that would "take care of this" dispute suddenly became "I am going to come back and kill everyone" and "I have something that will take care of all y'all." Defendant Tracy's outrageous lies told to further justify illegally firing Jonathan are direct evidence of actual malice under Texas Labor Code section 451.002(a).

## **WRONGFUL DEATH AND SURVIVORSHIP**

323.    Defendants' wrongful conduct proximately caused the death of Jonathan Layton. Jonathan Layton would have been entitled to bring this action had he lived. He would have been entitled to

and the Defendants would have been liable for Jonathan's pain and suffering while he lay dying on the floor of his mother's house.

324.    Jonathan Layton also would have been entitled to emotional distress damages and compensation for the damage to his reputation due to FaithCo's representative maliciously making a false 911 report to manufacture a reason to terminate him for cause and Larry Smith's false reports to the press that Jonathan had threatened the deputies with a gun implying that he deserved to be killed. Jonathan's claims survive in favor of his heirs.

## DAMAGES

325.    The Estate of Jonathan Layton is entitled to compensatory damages from Smith County in an amount to be determined at trial for the taking of Jonathan's life and the emotional distress caused by being shot in his home in front of his mother and brother and crying out for his mother as he painfully bled out and drowned in his own blood on her floor without due process guaranteed by the Fourth and Fourteenth Amendment of the United States Constitution.

326.    Nancy Layton as a bystander and person assaulted by Deputy Barnes is entitled to compensatory damages for loss of companionship, love, support, and services that Jonathan would have provided to her as her son. Nancy Layton is entitled to recover for her emotional distress, physical trauma and other damages recoverable at law and in equity.

327.    As a bystander and person assaulted by Deputy Barnes, Freddie Layton Jr. is entitled to recover for his emotional distress, physical trauma, and other damages recoverable at law and in equity.

328.    As a direct and proximate result of FaithCo's defamatory and criminal statement to the 911 operator, Jonathan Layton's reputation has been severely injured, and he was killed by Deputy

Barnes. As a result, the Estate of Jonathan Layton is entitled to compensatory damages in an amount to be determined at trial.

329.    Defendants FaithCo and Defendant Tracy's actions were negligent, gross negligent, reckless, intentional, extreme and outrageous. The actions of FaithCo caused the Layton Family to suffer extreme mental anguish in witnessing Jonathan being shot, suffer, and die on the floor of their home, in addition to the public humiliation and embarrassment as these Defendants' lies were repeated by Larry Smith to the press and then amplified on social media. As a result, Nancy Layton and Freddie Layton Jr. are entitled to compensatory damages in an amount to be determined at trial.

330.    As a direct and proximate result of Larry Smith's defamatory statements to the press that were completely unnecessary and outside of his official duties, Jonathan Layton's reputation has been severely injured and the Layton Family suffered repeated harassment online.  As a result, the Estate of Jonathan Layton is entitled to compensatory damages in an amount to be determined at trial.

331.    The Estate of Jonathan Layton is entitled to actual economic damages for lost wages and past benefits due to FaithCo terminating him in retaliation for seeking workers' compensation benefits and the advice of counsel. TEX. CIV. PRAC. & REM. CODE §41.001(4). The estate is also entitled to recover Jonathan's mental anguish damages for retaliatory termination.

## EXEMPLARY DAMAGES

332.    Deputy Barnes's reckless and callous actions of shooting Jonathan Layton in his mother's home and the ***deliberate indifference*** of Larry Smith and Smith County to proper training, hiring and disciplinary practices at the Smith County Sheriff's Office are particularly egregious and

warrant punishment beyond compensatory damages. Therefore, Plaintiffs request punitive damages to punish the Smith County Defendants and deter future misconduct.

333.    The Estate of Jonathan Layton is entitled to exemplary damages from FaithCo because slanderous statements were made with malice to create a reason to fire him for cause as a defense to any wrongful termination case he may have had when he was fired due to his injury and FaithCo's unwillingness to provide him light duty work and in retaliation for seeking advice of counsel.

334.    Plaintiffs Nancy Layton and Freddie Layton Jr. are also entitled to exemplary damages due to the malicious nature of the false 911 call that resulted in them witnessing Jonathan being shot by a Sheriff's deputy, struggle to breathe with destroyed lungs, and bleed out on the living room floor of the house they still live in while Jonathan was pleading for his mother to hold his hand.

335.    Plaintiffs are also entitled to exemplary damages from Larry Smith in his individual capacity because he stepped out of his official capacity when he gratuitously decided to make false statements to the press with the malicious intent to slander Jonathon Layton with foreseeable and proximate harm to Jonathan and the Layton Family's reputation.

336.    FaithCo's termination of Jonathan in retaliation for seeking worker's compensation benefits and the advice of an attorney was done with actual malice entitling the estate to punitive damages. TEX. LAB. CODE § 451.002(a).  Taylor Tracy falsely reporting on a 911 call that Jonathan had threatened to kill people at FaithCo and then sending deputies to Jonathan's home in violation of Texas Penal Code section 42.0601 firmly and objectively demonstrates Mr. Taylor's ill-will, spitefulness, evil motive, and specific intent to cause Jonathan Layton injury.

## **JURY DEMAND**

337.    Plaintiffs request a trial by jury pursuant to FED. R. CIV. P. 38.

PLAINTIFFS' ORIGINAL COMPLAINT AND DEMAND FOR JURY – Page 74

## **PRAYER**

338.    Plaintiffs request that Defendants be cited to appear and answer, and that on final trial, Plaintiffs are granted the following:

a.    Judgment against the Defendants for actual damages;

b.    Judgment for exemplary damages against the Defendants in a sum sufficient to punish the Defendants for killing Jonathan Layton, terrifying Nancy Layton and Freddie Layton Jr., and destroying Jonathan Layton's reputation, and sufficient to deter such conduct in the future;

c.    Pre-judgment and post judgment interest as provided by law;

d.    Attorneys' fees pursuant to 42 U.S.C. § 1988;

e.    Costs of suit; and

f.    Such other and further relief to which the Plaintiffs may be entitled.

Dated: May 27, 2025

Respectfully Submitted,

*/s/ Michael W. Shore*
Michael W. Shore
Texas Bar No. 18294915
Zachary R. Della Porta
Texas Bar No. 24134899

The Shore Firm LLP
5646 Milton Street, Suite 423
Dallas, Texas 75206
mshore@shorefirm.com
zdellaporta@shorefirm.com
Telephone: (214) 593-9110

Kenneth E. Shore
Texas Bar No. 24027972
The Shore Firm LLP
1518 Colony Circle
Longview, Texas 75604
kshore@shorefirm.com
Telephone: (214) 593-9110

Ted B. Lyon
Dennis Weitzel
Ted B. Lyon & Associates, P.C.
Town East Tower – Suite 525
18601 LBJ Freeway
Mesquite, Texas 75150
Telephone: (972) 279-6571
Facsimile: (972) 279-3021